[Nos. 52570–6, 52689–3,     En Banc.     November 13, 1986.]
52688–5, 52613–3.

*In the Matter of the Detention of*
THOMAS LABELLE.

*In the Matter of the Detention of*
MAURICE MARSHALL.

*In the Matter of the Detention of*
HAROLD RICHARDSON.

*In the Matter of the Detention of*
GERALD TRUEBLOOD.

*John H. Hertog, Jr., George Yeannakis,* and *Ani Vajra Sakya* of *Seattle–King County Public Defender Association,* for appellant LaBelle.

*John H. Hertog, Jr.,* and *Jacqueline McMurtrie* of *Seattle–King County Public Defender Association,* for appellant Marshall.

*John H. Hertog, Jr.,* and *Jean Rietschel* of *Seattle–King County Public Defender Association,* for appellant Richardson.

*Mark W. Muenster* of *Washington Appellate Defender Association,* for appellant Trueblood.

*Norm Maleng, Prosecuting Attorney, Terence D. Harrington, Special Deputy,* and *Gerald A. Smith, Deputy,* for respondent.

BRACHTENBACH, J.—Appellants Thomas LaBelle, Maurice Marshall, Harold Richardson, and Gerald Trueblood appeal from separate orders involuntarily committing them for treatment of mental disorders under RCW 71.05 following hearings at which the trial court found them "gravely disabled". In these consolidated cases appellants challenge *inter alia* the constitutionality of the gravely disabled standard for involuntary civil commitment and the sufficiency of the evidence thereunder. We affirm in part and reverse in part.

Appellants LaBelle, Marshall, and Richardson in separate incidents were initially detained at the Highline Evaluation and Treatment Facility for 72–hour evaluation and treatment pursuant to the emergency custody procedures of RCW 71.05.150(2). In each case, a petition for 14–day involuntary treatment was filed, *see* RCW 71.05.230, and following a probable cause hearing held pursuant to RCW 71.05.240, the trial court ordered appellants detained for an additional 14 days of involuntary treatment (Richardson agreed to entry of the 14–day commitment order without a hearing). Thereafter, petitions were filed for an additional 90 days of involuntary treatment. In each case, a full hearing on the petition was held pursuant to RCW 71.05.310 at which the trial court found appellants to be gravely disabled and ordered LaBelle and Richardson committed to Western State Hospital for 90 days and Marshall to Highline Evaluation and Treatment Facility for 90 days. Appellants appeal from these 90–day commitment orders.

Appellant Trueblood appeals from two separate orders. He was also initially detained for 72–hour evaluation and treatment. Following a probable cause hearing, he was found to be gravely disabled and committed for an additional 14 days. Trueblood appeals from this order. He later agreed to entry of an order for continued involuntary treatment in a less restrictive (outpatient) setting for 90 days. A petition for an additional 180 days of less restrictive treatment was filed, and following a full hearing, the trial court found him to be gravely disabled and ordered 180 days of less restrictive treatment. Trueblood appeals from this order as well.

All of these cases were transferred to this court from the Court of Appeals and consolidated. Appellants raise a number of issues, some of which are common to all of the cases, others of which are not. We begin with the common issues.

## I

█ A preliminary issue concerns whether we should even reach the merits of these cases because of mootness. In all of the cases, the detentions which are the subject of this appeal have long since ended. Where, as here, we can no longer provide appellants effective relief, the cases are moot. *See Dunner v. McLaughlin,* 100 Wn.2d 832, 676 P.2d 444 (1984); *In re Cross,* 99 Wn.2d 373, 662 P.2d 828 (1983).

Although these cases are technically moot, we may nevertheless decide them if they involve matters of continuing and substantial public interest. *Dunner,* at 838. We have recognized that "the need to clarify the statutory scheme governing civil commitment is a matter of continuing and substantial public interest." *Dunner,* at 838. There is a similar need for clarification here. Appellants raise issues of first impression concerning the gravely disabled standard of the civil commitment statutes, RCW 71.05. We will decide these cases on their merits.

## II

Appellants contend that the "gravely disabled" standard

for involuntary commitment is unconstitutionally vague. They also raise an overbreadth issue, although it is not denominated as such.

As constitutional doctrines, both vagueness and overbreadth challenges implicate due process concerns. The issue of vagueness involves the procedural due process requirements of fair notice of the conduct warranting detention and clear standards to prevent arbitrary enforcement by those charged with administering the applicable statutes. *Hontz v. State*, 105 Wn.2d 302, 308, 714 P.2d 1176 (1986). Overbreadth is essentially a matter of substantive due process; it requires the judiciary to determine whether the statutory criteria provide a constitutionally adequate basis for detention. *See In re Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982).

As appellants point out, involuntary commitment for mental disorders is a significant deprivation of liberty which the State cannot accomplish without due process of law. *E.g., Dunner v. McLaughlin, supra* at 838; *In re Harris, supra.* The United States Supreme Court has described involuntary commitment as "a massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972). Although it is clear that the State has a legitimate interest under its police and *parens patriae* powers in protecting the community from the dangerously mentally ill and in providing care to those who are unable to care for themselves, it is also clear that mental illness alone is not a constitutionally adequate basis for involuntary commitment. *See O'Connor v. Donaldson*, 422 U.S. 563, 575, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975). *Cf. Dunner v. McLaughlin, supra* at 839. Thus, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor,* at 576.

With these principles in mind, we turn now to the challenged statutory provisions.

Generally, under the statute, RCW 71.05, persons may be

involuntarily committed for treatment of mental disorders if, as a result of such disorders, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely disabled. *See* RCW 71.05-.020(1), (3), .150, .240, .280, .320. Petitioners were committed under the gravely disabled standard. "Gravely disabled" is defined in RCW 71.05.020(1) as:

> a condition in which a person, as a result of a mental disorder:[1] (a) Is in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety;

It is apparent that RCW 71.05.020(1) sets forth two alternative definitions of "gravely disabled", either of which provides a basis for involuntary commitment and both of which are challenged by petitioners. We hold that these commitment criteria, as construed below, are neither unconstitutionally vague nor overbroad.

Appellants contend that the definition of gravely disabled found in subsection (a) of RCW 71.05.020(1) is unconstitutional unless it is construed to require an *imminent* or *present* danger of serious physical harm resulting from a failure to provide for essential health and safety needs. We do not agree.

■ Our decision in *In re Harris, supra,* is instructive in this regard. The petitioner in *Harris* challenged the constitutionality of the commitment criteria of RCW 71.05 that required the State to show that an individual presents "a likelihood of serious harm" to himself or others. In upholding the constitutionality of these commitment criteria we held that RCW 71.05's standard of dangerousness to self or

---

[1]"Mental disorder" is defined in RCW 71.05.020(2) to mean "any organic, mental, or emotional impairment which has substantial adverse effects on an individual's cognitive or volitional functions". Appellants do not challenge the definition of mental disorder. Nor do they challenge the trial court's findings that they suffered from a mental disorder.

others provides an adequate basis for involuntary commitment. *Harris,* at 284–85. We specifically rejected, however, a requirement that the danger of harm to oneself or others be "imminent." *Harris,* at 282. In so doing, we reasoned that "the practical effect of being placed in the hospital will usually eliminate the 'imminence' of one's dangerousness." *Harris,* at 284. A requirement of "imminence" would effectively invalidate commitment as soon as it occurs and would be inconsistent with the State's interest in confining those who pose a substantial risk of harm to themselves or others. *Harris,* at 284.

These same considerations apply here. Subsection (a) of RCW 71.05.020(1) requires the State to show that an individual, as a result of a mental disorder, is in danger of serious physical harm as a result of his or her failure to provide for essential health and safety needs. By the time the State files a petition for 14, 90 or 180 days of involuntary commitment under the gravely disabled standard, the individual will already have been detained in a hospital or treatment center for a period of time. The care and treatment received by the detained person in many cases will have lessened or eliminated the "imminence" of the danger of serious harm caused by that person's failure to provide for his essential health and safety needs. A requirement of "imminent" danger as a prerequisite to continued confinement could result in the premature release of mentally ill patients who are still unable to provide for their essential health and safety needs outside the confines of a hospital setting but who, because of their treatment there, are no longer in "imminent" danger of serious physical harm. The State's continuing interest in confining and treating such individuals would be frustrated by a requirement of "imminent" danger for all commitments.

This does not mean, however, that the State's burden of proving the risk of danger of serious harm is any less when proceeding under the "gravely disabled" standard as defined in RCW 71.05.020(1)(a) than when proceeding under the "danger to self or others" standard as construed

in *Harris*. Under the latter standard, the danger to self or others usually arises from *active* behavior as evidenced by "threats or attempts to commit suicide or inflict physical harm on one's self", RCW 71.05.020(3)(a), or as shown by physical harm inflicted upon another or behavior which placed another "in reasonable fear of sustaining such harm," RCW 71.05.020(3)(b), whereas under the gravely disabled standard, the danger of harm usually arises from *passive* behavior—*i.e.*, the failure or inability to provide for one's essential needs, RCW 71.05.020(1)(a). Under either standard, the potential for harm must be "'great enough to justify such a massive curtailment of liberty.'" *Harris,* at 283, quoting *Humphrey v. Cady,* 405 U.S. 504, 509, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972). In *Harris,* we held that the risk of danger to self or others must be substantial and the harm must be serious before involuntary commitment is justified. Similarly we construe the gravely disabled standard of RCW 71.05.020(1)(a) to require a showing of a substantial risk of danger of serious physical harm resulting from failure to provide for essential health and safety needs.

In so holding, we do not require, as we did in *Harris,* that the substantial risk of harm be evidenced by recent, overt acts. Such a requirement, which in *Harris* was deemed necessary to mitigate the problems inherent in accurately predicting dangerousness, has little relevance where, as here, any risk of danger arises primarily from passive neglect or inaction rather than from acts, attempts or threats of harm. Nonetheless, the nature of the inquiry under RCW 71.05-.020(1)(a), which necessarily involves critical judgments concerning a person's ability to provide for his basic needs, is such that there is a danger of imposing majoritarian values on a person's chosen lifestyle which, although not sufficiently harmful to justify commitment, may be perceived by most of society as eccentric, substandard, or otherwise offensive. In order to avoid the erroneous commitment of such persons under the gravely disabled standard, the State must present recent, tangible evidence of failure or inability

to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors. So construed, the definition of "gravely disabled" set forth in RCW 71.05.020(1)(a) is neither vague nor overbroad.

The alternative definition of gravely disabled set forth in RCW 71.05.020(1)(b) contains two requirements. The State must show not only that a person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control", but also that he or she "is not receiving such care as is essential for his or her health or safety". RCW 71.05.020(1)(b). Petitioners contend that these commitment criteria are unconstitutional if not strictly construed so as to exclude those persons whose condition has stabilized or improved, even if minimally (*i.e.,* is not "escalating"), by the time of the commitment hearing. We do not agree.

As petitioners point out, where as here a significant deprivation of liberty is involved, statutes must be construed strictly. *In re Cross,* 99 Wn.2d 373, 379, 662 P.2d 828 (1983). On the other hand, our primary objective in interpreting a statute is to ascertain and give effect to the intent of the Legislature. *State v. Keller,* 98 Wn.2d 725, 728, 657 P.2d 1384 (1983). In so doing, the spirit and intent of the law should prevail over the letter of the law. *In re R.,* 97 Wn.2d 182, 187, 641 P.2d 704 (1982). Furthermore, we will construe a statute so as to avoid strained or absurd consequences which could result from a literal reading. *State v. Keller, supra.*

The definition of gravely disabled in RCW 71.05.020-(1)(b) was added by the Legislature in 1979. *See* Laws of 1979, 1st Ex. Sess., ch. 215, § 5. It was intended to broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their

mental disorders who did not fit within the existing, restrictive statutory criteria. *See* Washington State Legislature, *Final Legislative Report 1979*, at 153. *See generally* Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395 (1985). By incorporating the definition of "decompensation," which is the progressive deterioration of routine functioning supported by evidence of repeated or escalating loss of cognitive or volitional control of actions, RCW 71.05.020(1)(b) permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit "rapid deterioration in their ability to function independently." Durham & LaFond, 3 Yale L. & Pol'y Rev., at 410.

Before passage of this expanded "gravely disabled" standard, these chronically ill persons could not be treated until they had decompensated to the point that they were in "danger of serious . . . harm" from their inability to care for themselves. *See* RCW 71.05.020(1)(a). The result is what has been described as the "revolving door" syndrome, in which patients often move from the hospital to dilapidated hotels or residences or even alleys, parks, vacant lots, and abandoned buildings, relapse, and are then rehospitalized, only to begin the cycle over again. *See* Rhoden, *The Limits of Liberty: Deinstitutionalization, Homelessness, and Libertarian Theory*, 31 Emory L.J. 375, 391 (1982); M. Hombs & M. Snyder, *Homelessness in America* 43 (1982). *See generally* Myers, *Involuntary Civil Commitment of the Mentally Ill: A System in Need of Change*, 29 Vill. L. Rev. 367 (1984). By permitting intervention before a mentally ill person's condition reaches crisis proportions, RCW 71.05.020(1)(b) enables the State to provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning. Such intervention is consonant with one of the express legislative purposes of the involuntary treatment act, which is to

."provide continuity of care for persons with serious mental disorders". RCW 71.05.010(4).

■ A strict and literal reading of RCW 71.05.020(1)(b) as asserted by petitioners is inconsistent with these legislative purposes. It would also result in absurd and potentially harmful consequences, for a court would be required to release a person whose condition, as a result of the initial commitment, has stabilized or improved minimally—*i.e.*, is not longer "escalating"—even though that person otherwise manifests severe deterioration in routine functioning and, if released, would not receive such care as is essential for his or her health or safety. Such consequences could not have been intended by the Legislature in enacting RCW 71.05-.020(1)(b).

Nonetheless, the broadened commitment standard found in RCW 71.05.020(1)(b) raises serious constitutional concerns as to its application. There is a danger that persons will be involuntarily committed under this standard solely because they are suffering from mental illness and may benefit from treatment. Involuntary commitment on this basis alone is not supported by a sufficiently compelling state interest to justify such a significant deprivation of liberty. As noted by the United States Supreme Court, "there is . . . no constitutional basis for confining . . . [mentally ill] persons involuntarily if they are dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson*, 422 U.S. 563, 575, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975).

In addition, because RCW 71.05.020(1)(b) incorporates medical terminology, a decision to commit under this standard may involve more a medical decision than a legal one. Note, *Constitutionalizing Civil Commitment: Another Attempt—In re Harris, 98 Wn.2d 276, 654 P.2d 109 (1982)*, 59 Wash. L. Rev. 375, 397 (1984). Consequently, there is a danger that excessive judicial deference will be given to the opinions of mental health professionals, thereby effectively insulating their commitment recommendations from judicial review. *See* Durham & LaFond, 3 Yale L. & Pol'y Rev.,

at 430–31.

Accordingly, when the State is proceeding under the gravely disabled standard of RCW 71.05.020(1)(b), it is particularly important that the evidence provide a factual basis for concluding that an individual "manifests severe [mental] deterioration in routine functioning". Such evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

Furthermore, the mere fact that an individual is mentally ill does not also mean that the person so affected is incapable of making a rational choice with respect to his or her need for treatment. Implicit in the definition of gravely disabled under RCW 71.05.020(1)(b) is a requirement that the individual is *unable,* because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment. This requirement is necessary to ensure that a causal nexus exists between proof of "severe deterioration in routine functioning" and proof that the person so affected "is not receiving such care as is essential for his or her health or safety". So construed, RCW 71.05.020(1)(b) is neither unconstitutionally vague nor overbroad.

## III

We turn now to the primary issue in this appeal— whether there was sufficient evidence in each of the cases to support the trial court's finding that appellants were gravely disabled.

A threshold inquiry concerns the proper standard

of review. The burden of proof at 90–day or 180–day involuntary commitment proceedings is by clear, cogent and convincing evidence, RCW 71.05.310, which means the ultimate fact in issue must be shown by evidence to be "highly probable." *See In re Pawling,* 101 Wn.2d 392, 399, 679 P.2d 916 (1984); *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973). Generally, where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. *Ridgeview Properties v. Starbuck,* 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). However, where the State must prove its case by clear, cogent and convincing evidence, the evidence must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence, *In re Hall,* 99 Wn.2d 842, 849, 664 P.2d 1245 (1983); in other words, the findings must be supported by substantial evidence in light of the "highly probable" test. *In re Pawling, supra* at 399. Accordingly, we will not disturb the trial court's findings of "grave disability" if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing.

In all of the cases here, it is undisputed that appellants were suffering from a mental disorder. Thus, our inquiry is limited to determining whether, as a result of the disorder, appellants were gravely disabled as found by clear, cogent and convincing evidence.

In the LaBelle case, the State alleged and the trial court found that LaBelle was gravely disabled under the subsection (b) definition of RCW 71.05.020(1). The State's evidence consisted of the testimony of Dr. Stanley Mandell, a licensed clinical psychologist, who testified that in his opinion LaBelle suffers from a mental disorder and as a result manifests such severe deterioration of his ability to function on a routine level that, if released, he would not receive such care as is essential for his health or safety. Dr. Mandell's testimony was based upon his personal observa-

tions and interviews with LaBelle, psychological tests, discussions with staff members at the hospital, evidence from the prior 14-day probable cause hearing, and review of the medical records.

The unrebutted evidence adduced at the hearing indicates that LaBelle suffered from severe cognitive and functional impairment as evidenced by impaired memory loss, inability to respond appropriately to questions, and disorientation. Although there was evidence that LaBelle's condition had stabilized or improved slightly while in the hospital, the evidence also indicated that LaBelle's disorientation and mental impairment remained such that he was unaware of his surroundings much of the time.

The evidence also indicated that LaBelle would not receive such care as is essential for his health and safety if released. His deterioration was such that he lacked awareness of hygiene and routine care and was unable to form realistic plans for taking care of himself outside the hospital setting other than resuming a lifestyle of living on the streets without adequate food and shelter. Although uncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital, the evidence here indicates that LaBelle's plans to live on the streets are not the result of a choice of lifestyle but rather a result of his deteriorated condition which rendered him unable to make a rational choice with respect to his ability to care for his essential needs. Based upon our review of the record, we conclude that the trial court's finding of "gravely disabled" was supported by substantial evidence of a clear and convincing nature.

In the Marshall case, the State alleged grave disability under the definition in RCW 71.05.020(1)(b). As in LaBelle's case, the State's evidence consisted of the testimony of Dr. Mandell.

Dr. Mandell's testimony was based upon two personal interviews with Marshall, the affidavit of a mental health worker at the King County Jail, and Marshall's medical records, which showed six to seven prior hospitalizations.

Dr. Mandell testified that Marshall suffered from a mental disorder of a chronic and substantial nature. He indicated that Marshall suffers from hallucinations, delusions, confusion and disorganization, but that his condition had stabilized because of the medication administered at the hospital.

Dr. Mandell also testified that Marshall reacts to situations with paranoia and hostility and tends to see people as doing harm to him. This testimony is based in part on Marshall's statements to him concerning a recent incident just prior to his hospitalization in which he had been arrested and jailed for assaulting a bartender whom he thought was reaching for a gun. There was also evidence of prior arrests for violent behavior. Dr. Mandell described a recent evaluation by a mental health worker a few days after Marshall's most recent arrest and just prior to his hospitalization in the following terms: "decompensated, disorganized, confused, significant latency in his speech, responding to internal stimuli, speaking in gibberish, poor insight into his condition and refusal for psychiatric treatment." Mental Illness Hearing, at 6 (June 7, 1985).

Doctor Mandell's opinion that Marshall was unable to provide for his essential health and safety needs was based in part on Marshall's statements to him that when out of food and money or a place to stay he tended to wind up in jail. Dr. Mandell attributed this pattern to Marshall's difficulty in maintaining himself as a result of his mental disorder. The evidence indicates that just prior to hospitalization, Marshall had been "living on the streets" without any source of income. His opinion that Marshall was unable to care for himself without treatment was also based on Marshall's inability to fill out necessary welfare forms while in the hospital or to seek assistance from hospital employees for this purpose. There is also evidence that Marshall lacked any awareness of his need for the necessary medication to stabilize his symptoms.

Finally, Dr. Mandell testified that inpatient care is necessary because Marshall's condition, although in the process

of stabilizing, would decompensate rapidly upon release without treatment. It is also necessary, in his opinion, because Marshall is opposed to medication or follow-up treatment and does not have enough organization to be able to cooperate in a less restrictive setting.

Marshall testified on his own behalf, outlining his plans upon release to live at the Mission or with his sister, to have his sister help him fill out the welfare forms, to obtain welfare and to find his own apartment.

Based upon this evidence, the trial court concluded that Marshall was gravely disabled under the criteria set forth in RCW 71.05.020(1)(a). In so concluding, the court expressly chose not to rely upon Dr. Mandell's opinion of grave disability under RCW 71.05.020(1)(b). The court found that Marshall was a danger to himself because of reactive and hostile conduct which the court found to be uncontrolled and treatable. The trial court concluded that the evidence was clear, cogent and convincing as exhibited by Marshall's recent past conduct.

Although the trial court's finding of grave disability is supported by clear, cogent and convincing evidence, the court's reliance on the criteria of RCW 71.05.020(1)(a) is misplaced. The trial court found that Marshall's hostile and reactive behavior placed him in danger of serious physical harm. We agree that there is a danger that someone will respond in kind to Marshall's potentially violent and hostile conduct. This danger is usually inherent in any hostile confrontation, but it is not the kind of danger contemplated by RCW 71.05.020(1)(a), which involves the likelihood of serious harm to a person from his failure to provide for such essential needs as food, clothing and shelter. Here there is very little evidence of a risk of danger from Marshall's failure to provide for such needs. The evidence of his hostile and reactive behavior, which is supported by his recent acts that led to his arrest for assault, would instead justify commitment based on the "likelihood of serious harm to others" standard of RCW 71.05.280(1)(b).

We need not consider this possibility further, however,

because we conclude that the State presented substantial evidence of grave disability under RCW 71.05.020(1)(b) which the trial court could reasonably have found to be clear, cogent and convincing. There is ample evidence in the record of severe deterioration of mental functioning as evidenced by significant impairment of cognitive control immediately prior to and during his stay in the hospital. Although Marshall's deteriorated condition was in the process of stabilizing because of his treatment in the hospital, there is ample evidence that without such treatment, and if released, Marshall would rapidly decompensate.

There is also sufficient evidence that treatment for his mental disorder is essential to Marshall's health and safety. There is clear, cogent and convincing evidence that medication is necessary to stabilize the mental deterioration and the conduct therefrom that resulted in his initial confinement. It is also evident that Marshall is unable to understand his need for treatment and, if released, would not follow through with the prescribed treatment.

Appellant contends that, because he would be able to adequately provide for his essential needs based on his plan to stay at the Mission or his sister's home and to apply for welfare assistance, continued commitment is not justifiable. However, even if appellant were able to provide for his essential food and shelter needs, which is not apparent from the evidence, the evidence indicates that without treatment for his mental disorder he would rapidly exhibit those symptoms which resulted in his initial confinement. Even with his basic food and shelter needs met, the evidence suggests a substantial likelihood that Marshall cannot yet function safely or independently in the community.

Richardson's 90–day commitment was based on the alternative definition of gravely disabled set forth in RCW 71.05.020(1)(a). Again, the State's only evidence consisted of the testimony of Dr. Mandell, who based his opinion that Richardson was "at substantial risk for serious physical harm" on three factors: (1) When Richardson was initially detained, he was suffering from a serious case of

impetigo for which he would not get treatment; (2) Richardson mentioned to Dr. Mandell that he experienced intermittent pain in a tooth and had not been to the dentist in 12 years; and (3) Richardson indicated that he was not eating well before he was hospitalized but was unwilling to consider the possible consequences of that or to seek medical help.

On the basis of this evidence, the trial court concluded that Richardson was gravely disabled because of a risk of physical harm from his failure to provide for his essential needs. We conclude that these findings are not supported by clear, cogent and convincing evidence. First, the evidence indicated that the impetigo no longer required medical attention. Second, there was no evidence that the dental problem involved any risk of harm to Richardson. And finally, even if Richardson was not eating well, there was no evidence that he was in any danger therefrom or that it was a result of his mental disorder. Under these circumstances, the risk of physical harm from Richardson's tendency to neglect his health was too speculative and insubstantial to justify continued commitment for 90 days under the gravely disabled standard of RCW 71.05.020(1)(a).

Appellant Trueblood challenges the sufficiency of the evidence of grave disability in both his 14–day and 180–day commitment hearings.

The standard of proof at a 14–day probable cause hearing is "preponderance of the evidence." RCW 71.05.240. Here the State presented evidence under subsection (b) of RCW 71.05.020(1). The State's evidence consisted of the testimony of two witnesses: Trueblood's apartment manager and Dr. Thomas Hyde, a licensed clinical psychologist.

The apartment manager, who had known Trueblood for a number of years, testified that Trueblood kept the heat off in cold weather even though it was provided at no cost, kept garbage in the sink and wet clothes in the shower, had piles of newspaper 6 inches from the heater, was noticeably losing weight, talked about communicating with the dead at graveyards and exhibited other bizarre behavior, and was

letting personal hygiene deteriorate.

The State's other witness, Dr. Hyde, based his testimony on a personal interview with Trueblood, review of the medical charts and records, and observations during the hearing. His testimony indicates that Trueblood was in an acute phase of chronic schizophrenia. He testified that the weight loss, poor hygiene, delusions and disorganized thinking point to a repeated and escalating loss of cognitive or volitional control.

The testimony also indicated that because of Trueblood's deteriorating mental condition he was unable to formulate realistic plans to provide essential care: Trueblood had no place to stay and he mentioned somewhat vague plans to stay all night in a diner or to buy a sleeping bag and a tent and camp out in parks or to go Bellevue and get in contact with dead people. The evidence also indicates that Trueblood lacks insight into his condition, blames prior hospitalizations on other people's problems, and is not interested in taking medication or otherwise seeking treatment. In Dr. Hyde's opinion, Trueblood would not last 24 hours in the community before he would have to be rehospitalized.

Trueblood testified on his own behalf as to his plans if released, including his plans initially to stay at all–night restaurants until he could find an apartment, to camp out, and to visit cemeteries and leave messages there.

Based upon this evidence and its own observation of Trueblood at the hearing, the court found that Trueblood was gravely disabled as a result of severe deterioration of routine functioning that left him unable to care for his basic needs. There is substantial, uncontroverted evidence to support the trial court's findings. Although some of the evidence relied upon by the court, particularly the testimony of the apartment manager, goes only to show that Trueblood was a messy and perhaps somewhat eccentric housekeeper, there is ample evidence in the record to indicate severe deterioration of routine functioning, including escalating and repeated loss of cognitive and volitional control, and an inability to care for essential needs. There is

also evidence that Trueblood was unable to make a rational decision with respect to his need for treatment and care and that treatment was essential to his health and safety. We conclude that the trial court's finding of grave disability is amply supported by the evidence.

At Trueblood's hearing on the petition for 180 days of less restrictive treatment, the State alleged grave disability under subsection (a) of RCW 71.05.020(1). The State's evidence consisted of the testimony of two witnesses.

The State's first witness was a social worker in charge of monitoring Trueblood's treatment program during the prior 90–day less restrictive treatment period. He testified that Trueblood began missing appointments with him, with his doctor, and in the medication clinic during the latter half of the 90–day treatment period. He also testified that Trueblood complained of feeling threatened and persecuted, complained of feeling unsafe in his apartment, mentioned that on several occasions he stayed overnight in parks where he felt safer, indicated several times that he wanted to discontinue treatment, and expressed a desire at one time to live in a tent on Snoqualmie Pass.

The State's other witness, Dr. Debra Wothers, a resident in psychiatry, treated Trueblood during the early part of his 90–day treatment period under the supervision of an attending psychiatrist. Dr. Wothers' testimony consisted of the following: that in her opinion Trueblood suffers from chronic paranoid schizophrenia; that during the time she treated him he was disheveled, unkempt, and losing weight which, given his history, indicated a decompensated state and which placed him in danger of serious harm; that his paranoid thinking made it difficult for him to feel comfortable in places where he is probably safer (*e.g.*, his apartment) and caused him to seek out places that are not as safe (*e.g.*, parks). However, Dr. Wothers also testified that she had last seen or treated Trueblood some 2 to 3 months prior to the hearing, that she was unaware of how he had been functioning in the interim, and that he was cognitively oriented and intact at the time of the hearing.

Trueblood testified that he could adequately take care of himself and would go to treatment on his own, that his apartment had been broken into twice, that he spent several nights in parks because he felt safer there but slept only for 2 hours on one occasion, that lately he had been feeling safer in his apartment and spending nights there, and that he long ago abandoned any plans to live at Snoqualmie Pass because of the difficulty of finding work and an adequate support system.

Based upon this evidence, the trial court found that Trueblood was gravely disabled without indicating which definition under RCW 71.05.020(1) was relied upon. Ostensibly the trial court relied upon the State's evidence under subsection (a).

Under either definition the State's evidence was not sufficiently clear, cogent and convincing to support a finding of "gravely disabled." Under the subsection (a) definition of gravely disabled, there was very little evidence that Trueblood was in substantial risk of serious physical harm because of failure to provide for his essential human needs. There was no evidence of recent weight loss or any other evidence suggesting that Trueblood was neglecting his essential needs of food, clothing and shelter. The only evidence of risk of harm was Trueblood's occasional overnight stays in parks but these incidents were infrequent and not shown to present a substantial risk of danger of serious physical harm.

Nor was there clear, cogent and convincing evidence of grave disability under subsection (b) of RCW 71.05.020(1). Although Dr. Wothers' testimony suggests that Trueblood may have been decompensating when she last saw him, her opinion is based upon observations and interviews some 2 to 3 months earlier. Her only opinion as to recent observations suggests that Trueblood was cognitively oriented and intact as of the time of the hearing. And the social worker's testimony, while based on more recent observations, tends only to prove that Trueblood was still suffering from a mental disorder; it does not provide clear and convincing

evidence of grave disability as a result of the mental disorder.

## IV

Appellants also contend that the written findings of fact in each of their cases were inadequate. Such findings are required by MPR 3.4(b), which provides: "[u]nless the matter is tried to a jury, the court shall make and enter findings of fact and conclusions of law."

In all of the cases here, the written findings consist of a preprinted standardized form reciting generally the statutory grounds for involuntary commitment and the requisite finding concerning the appropriateness of less restrictive treatment as an alternative to detention. *See* RCW 71.05-.280, .320. The inapplicable language on the form was crossed out; the remaining language consisted of the following findings of fact:

The Court finds by clear, cogent and convincing evidence that:
. . .
(c) The respondent is gravely disabled.
. . . The best interests of the Respondent or others will (not) be served by a less restrictive treatment which is an alternative to detention.

We agree with appellants that these findings are inadequate.

Generally, where findings are required, they must be sufficiently specific to permit meaningful review. *State v. Holland,* 98 Wn.2d 507, 517, 656 P.2d 1056 (1983). While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions. *Groff v. Department of Labor & Indus.,* 65 Wn.2d 35, 40, 395 P.2d 633 (1964); *State v. Russell,* 68 Wn.2d 748, 415 P.2d 503 (1966). The purpose of the requirement of findings and conclusions is to insure the trial judge " 'has dealt fully and properly with all the issues in the case before he decides it and so that the parties involved and this court on appeal may be fully informed as

to the bases of his decision when it is made.'" *State v. Agee,* 89 Wn.2d 416, 421, 573 P.2d 355 (1977), quoting *Roberts v. Ross,* 344 F.2d 747, 751 (3d Cir. 1965). However, a trial court is not required to make findings of fact on all matters about which there is evidence in the record; only those which establish the existence or nonexistence of determinative factual matters need be made. *Maehren v. Seattle,* 92 Wn.2d 480, 487–88, 599 P.2d 1255 (1979), *cert. denied,* 452 U.S. 938, 69 L. Ed. 2d 951, 101 S. Ct. 3079 (1981). Considered in isolation, the written findings here are not sufficiently specific to permit meaningful review. The language used is standardized and of necessity very general. The findings do not indicate the factual bases for the trial court's ultimate conclusion of grave disability; nor is it possible even to determine which alternative statutory definition of "gravely disabled" was relied upon by the trial court. Except for the different headings and signatures, the written findings in these cases are virtually interchangeable despite the factual dissimilarity of the cases.

■ Even if inadequate, written findings may be supplemented by the trial court's oral decision or statements in the record. *State v. Holland, supra* at 518. *Todd v. Superior Court,* 68 Wn.2d 587, 414 P.2d 605 (1966). In addition, where, as here, no exceptions are taken below to the findings, we will give them a liberal construction rather than overturn the judgment based thereon. *Lauridsen v. Lewis,* 50 Wash. 605, 608–09, 97 P. 663 (1908). Although we conclude that the written findings here are inadequate, we think it appropriate in these cases to look to the entire record, including the trial courts' oral decisions, in order to determine the sufficiency of the evidence supporting the trial courts' ultimate findings of grave disability. In the Marshall and Richardson cases, and in the Trueblood case relating to the 14–day commitment order, the trial court orally recited the evidentiary facts it relied upon in making its decision. In the LaBelle case, the record at least indicates the statutory criteria of "gravely disabled" relied upon. And in the Trueblood case relating to the 180–day

commitment order, although the trial court's findings do not indicate the reasons for its conclusion that appellant was gravely disabled, the evidence adduced at trial and the court's oral statements suggest the statutory criteria relied upon.

Nonetheless, our review of these cases is hampered by the trial court's mostly conclusory and general findings, both oral and written. While not fatal in these cases, such findings hereafter are not adequate. Written findings indicating that the court considered the applicable statutory criteria should be entered in all instances where involuntary commitment is ordered, except where the case is tried by a jury. The degree of particularity of the findings will depend on the circumstances of the particular case. At the very least, the findings should indicate the factual basis underlying the court's conclusion that a person is "gravely disabled" and would not benefit from less restrictive treatment.

V

Appellant Trueblood raises two additional issues not raised by the other appellants. One relates to the order committing him for 14 days, the other to the order of 180–day less restrictive treatment.

Appellant first contends that the standard of proof at his 14–day commitment hearing violates due process. The requisite standard of proof in a probable cause hearing for an additional 14 days of involuntary commitment is by a preponderance of the evidence. RCW 71.05.240. In contrast, the burden of proof in 90–day commitment proceedings is by clear, cogent and convincing evidence. RCW 71.05.310. Appellant contends that due process requires that the same standard of proof apply to both proceedings. We do not agree.

Appellant relies upon *Addington v. Texas*, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979), wherein the United States Supreme Court held that a "clear and convincing" standard of proof is required by the Fourteenth Amend-

ment in a civil proceeding to commit a person involuntarily to a mental hospital for an indefinite period. *Addington* is not applicable, however. The Court addressed minimum due process standards in the context of a full hearing to commit for an indefinite period whereas this case involves a probable cause hearing to commit for a maximum of 14 days.

The appropriate test for reviewing the constitutional adequacy of involuntary commitment procedures involves the balancing of several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substantive procedural requirement would entail.

*Dunner v. McLaughlin,* 100 Wn.2d 832, 839, 676 P.2d 444 (1984), quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

As for the private interest affected by the 14–day commitment proceedings, this court has repeatedly recognized the significant deprivation of liberty and the adverse social consequences to the individual engendered by involuntary commitment. *See, e.g., Dunner v. McLaughlin, supra* at 838–39; *In re Harris,* 98 Wn.2d 276, 279–80, 654 P.2d 109 (1982). On the other hand, we have also recognized the State's legitimate interest under its police and *parens patriae* powers in protecting the community against dangerously disturbed individuals and in providing care to its citizens who are unable, because of mental illness, to care for themselves. *See, e.g., Dunner v. McLaughlin, supra* at 839.

We are persuaded that the lesser standard of proof adopted by the Legislature strikes a fair balance between the interests of the individual and the interests of the State given the important role served by the probable cause

hearing in the involuntary commitment process. On the one hand, the probable cause hearing protects liberty interests by assuring prompt judicial review of the adequacy of the State's grounds for detaining an individual beyond the initial 72–hour evaluation and treatment period of RCW 71.05.150. On the other hand, the lesser standard of proof at a probable cause hearing protects the State's *parens patriae* interests by increasing the probability that those mentally ill persons who remain in serious need of treatment beyond the 72–hour evaluation and treatment period will continue to receive short–term treatment (a maximum of 14 days) until such time as the more formal 90–day commitment hearing under RCW 71.05.310 can be held.

Imposition of a higher standard of proof would create an unreasonable procedural barrier to such short–term involuntary commitments. Under RCW 71.05.240, a probable cause hearing is mandatory within 72 hours of detention if the State wishes to confine an individual beyond the initial evaluation and treatment period. The State's ability to marshal the necessary evidence to meet the statutory commitment criteria by the time of the hearing would be severely hampered by imposition of a stricter burden of proof.

Moreover, the probable cause hearing is accompanied by a number of procedural safeguards which adequately lessen the risk of an erroneous decision under the lesser burden of proof. At the probable cause hearing, a detained person is granted the following rights: (1) to have an attorney represent him; (2) to present evidence on his behalf; (3) to cross–examine witnesses who testify against him; (4) to be proceeded against by the rules of evidence; (5) to remain silent; and (6) to view and copy all petitions and reports in the court file. *See* RCW 71.05.200, .250; *Dunner,* at 840. In addition, before continued commitment can be ordered, the judge must find that one of the statutory grounds for commitment is present and also that no less restrictive alternatives to commitment are available which would be in the detainee's best interest. RCW 71.05.240. A more formal

hearing is required, including the further protections of a right to a jury and proof by clear, cogent and convincing evidence, if commitment beyond the 14–day period is sought. We conclude that these procedural protections are sufficient to satisfy due process without the additional requirement of a "clear and convincing" standard of proof at a probable cause hearing under RCW 71.05.250.

Appellant Trueblood also raises the issue of whether the trial court erred in finding a waiver of the physician–patient privilege and in thus admitting the testimony of appellant's treating physician, Dr. Wothers, at the hearing for 180 days of less restrictive treatment.

In Washington, a physician–patient privilege has been created by statute. RCW 5.60.060(4) reads:

> A physician or surgeon or osteopathic physician or surgeon shall not, without the consent of his patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him to prescribe or act for the patient . . .

Laws of 1986, ch. 305, § 101. Provision for the waiver of the physician–patient privilege in the involuntary commitment context is found in RCW 71.05.250, which provides in relevant part:

> The physician–patient privilege shall be deemed waived in proceedings under this chapter when a court of competent jurisdiction in its discretion determines that it is unreasonable for the petitioner seeking fourteen–day involuntary treatment to obtain a sufficient evaluation of the detained person by a psychiatrist or psychologist or other health professional and such waiver is necessary in the opinion of the court to protect either the detained person or the public.
>     . . . *Provided however,* That the physician–patient privilege shall not be waived if the physician specifically identifies himself to the detained person as one who is communicating with that person for treatment only: . . .

This compulsory waiver statute by its terms applies only to 14–day commitment hearings. In *In re R.,* 97 Wn.2d 182, 641 P.2d 704 (1982), we held that the waiver statute is applicable to 90–day commitment hearings inas-

much as the statute pertaining to 90–day hearings, RCW 71.05.310, incorporates by reference the evidentiary provisions of RCW 71.05.250, including the compulsory waiver provisions. The statute relating to 180–day extension hearings, RCW 71.05.320, provides that such hearings shall be held as provided in RCW 71.05.310. It thus follows that the compulsory waiver statute applies to 180–day extension hearings as well.

In this case, it is undisputed that Dr. Wothers was appellant's treating physician. At the hearing the attorney for appellant objected to the testimony of Dr. Wothers on the ground of the physician–patient privilege. The trial court overruled the objection. It found that it would be unreasonable to require the State to obtain a nontreating physician's evaluation because appellant had missed appointments and was thus unavailable for evaluation prior to the hearing. Accordingly, the trial court held that the privilege was waived under the mandatory waiver provisions of RCW 71.05.250.

Appellant contends that the trial court abused its discretion in so ruling. We do not agree. There is ample evidence in the record that appellant, who was receiving outpatient treatment, missed his treatment appointments for several weeks prior to the hearing and was unavailable for evaluation by a nontreating psychiatrist. From the trial court's unique vantage point in assessing the nature of appellant's mental illness and the history of his treatment, we cannot say that it was unreasonable for the court to have determined that the treating psychiatrist's testimony was necessary to enable it to make an informed and intelligent judgment with respect to further need for treatment. Appellant has not alleged that waiver of the privilege in this case would harm the physician–patient relationship or otherwise interfere with his treatment. Nor has appellant alleged that Dr. Wothers told appellant that she was communicating with him for treatment only. Under the circumstances, we conclude that the trial court could justifiably find that it was unreasonable for respondent to

obtain a sufficient evaluation by a nontreating psychiatrist.

## VI

In summary, we hold that: (1) the "gravely disabled" criteria of RCW 71.05.020(1) are not unconstitutionally vague or overbroad; (2) the written findings of fact are inadequate; however, the lack of adequate written findings will not preclude review of these cases; (3) the evidence was sufficient to support a finding of grave disability in the cases of LaBelle, Marshall and Trueblood (14–day commitment order) but not in the cases of Richardson and Trueblood (180–day commitment order); (4) the statutory standard of proof in a probable cause hearing under RCW 71.05 satisfies due process; (5) the trial court did not err in finding a waiver of the physician–patient privilege at Trueblood's 180–day extension hearing.

Accordingly, the orders committing LaBelle for 90 days, Marshall for 90 days, and Trueblood for 14 days are affirmed. The orders committing Richardson for 90 days and Trueblood for 180 days of less restrictive treatment are vacated.

DOLLIVER, C.J., PEARSON, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., and CUNNINGHAM, J. Pro Tem., concur.