# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Detention of:<br><br>B.L.R.<br><br>                         Petitioner. | No. 53204-2-II<br><br>UNPUBLISHED OPINION |

MAXA, J. – BLR appeals a trial court order involuntarily committing him to Western State Hospital (WSH) for an additional 180 days of mental health treatment. BLR was involuntarily committed for an initial 180 days after the trial court found he was incompetent to face felony criminal charges related to his alleged assault of his father.

Under RCW 71.05.320(4)(c),[1] a person can be involuntarily recommitted for an additional 180 days if he or she has committed acts constituting a felony and "continues to present a substantial likelihood of repeating acts similar to the charged criminal behavior." A person also can be involuntarily recommitted under RCW 71.05.320(4)(d) if he or she continues to be "gravely disabled." The trial court's recommitment order was based on both grounds: that BLR continued to present a substantial likelihood of repeating acts like the assault against his father and that he was gravely disabled.

---

[1] RCW 71.05.320 was amended in 2018, but we will not use "former" in relation to this statute because the amendment was minor and does not affect any substantive provisions.

BLR argues that the trial court erred in entering the order committing him for an additional 180 days of treatment because the State failed to show that he continued to be gravely disabled as defined in former RCW 71.05.020(22) (2019).[2] The State argues that BLR's appeal is moot because BLR does not challenge the trial court's alternative ground for recommitting him, which requires us to affirm.

We hold that (1) BLR's appeal is not moot because even though we must affirm on the unchallenged alternative ground for recommitment, the trial court's conclusion that BLR was gravely disabled could have adverse consequences in future commitment proceedings; and (2) substantial evidence supports the trial court's determination that BLR was gravely disabled under both former RCW 71.05.020(22)(a) and (b). Accordingly, we affirm the trial court's recommitment order.

FACTS

In December 2017, BLR assaulted his father, with whom he had been living, by repeatedly punching him in the face and choking him. BLR was charged with second degree assault and felony harassment. In May 2018, the superior court dismissed the criminal charges without prejudice after finding that BLR was incompetent and ordered that he be committed to WSH for evaluation.

A mental health professional and a physician from WSH sought BLR's involuntary treatment for 180 days under RCW 71.05.280(3) and (4). The petition alleged that BLR had committed a "violent offense" under RCW 9.94A.030 and presented a substantial likelihood of repeating acts similar to the December assault. The petition also alleged that BLR was gravely

---

[2] The definition currently is found at RCW 71.05.020(21).

disabled. In support of the petition, the petitioners reported that this hospitalization was BLR's fifth, having previously been admitted in August 2011, February to October 2013, February to September 2014, and April 2016 to July 2017. The petitioners diagnosed BLR with schizoaffective disorder, bipolar type with antisocial traits.

The trial court entered an order committing BLR for involuntary treatment. The court described BLR's assault on his father, determined that BLR presented a substantial likelihood of repeating similar acts, and found that the acts BLR had committed constituted a "violent offense" under RCW 9.94A.030. The trial court also found that BLR was gravely disabled. The trial court ordered 180 days of inpatient treatment.

In October 2018, petitioners from WSH sought BLR's involuntary treatment for an additional 180 days. The petition alleged that BLR "continue[d] to present a substantial likelihood of repeating acts similar to the charged criminal behavior," and was gravely disabled. Clerk's Papers (CP) at 35. The motion was supported by a lengthy declaration from the petitioners detailing BLR's history, mental illness diagnosis and symptoms, and current condition.

The trial court held a hearing on the petition for recommitment. Dr. Shamyka Sutton, a clinical psychologist at WSH and one of the petitioners, testified that BLR suffered from "schizoaffective disorder and unspecified personality disorder, specifically antisocial personality disorder traits." Report of Proceedings (RP) at 51. Dr. Sutton stated that BLR continued to exhibit "suspiciousness" and "poor insight with regards to his symptoms," possibly because of "paranoid ideations." RP at 51. As of late October 2018, there were reports that BLR was still "responding to internal stimuli" and having "some mood lability and agitation." RP at 51. BLR continued to have poor judgment regarding how to take care of his mental health symptoms.

Dr. Sutton believed that because of BLR's mental disorder, it was unlikely that he would be able to consistently meet his basic health and safety needs if released from WSH. BLR especially would have difficulty obtaining housing because he continued to not believe that he had a mental illness and refused to reside with family members or to obtain services like social security that would help him maintain necessities like housing, food, and clothing. Dr. Sutton believed that he was likely to stop taking medication if released because he did not believe he had a mental illness. She stated that, given BLR's history, it was likely that if released BLR would rapidly decompensate, increase his paranoid ideation, experience a re-emergence of auditory hallucinations, and use substances as a coping mechanism, leading to re-hospitalization or additional offenses. Dr. Sutton concluded that placement at WSH currently was in BLR's best interest.

BLR did not call an expert witness to testify at the hearing. BLR testified that if released he would switch to the medication he had been taking during the time he lived with his father. BLR stated that he would seek mental health treatment after release but could not remember his former provider's name and believed the provider had shut down his practice. If released, he would investigate living at a homeless camp, but did not want to go to a mental health group home and did not know how to find a standard apartment.

The trial court entered an order committing BLR for up to an additional 180 days of inpatient treatment. The court entered a finding of fact that BLR was "in custody pursuant to RCW 71.05.280(3) and as a result of a mental disorder continue[d] to present a substantial likelihood of repeating acts similar to the charged criminal behavior." CP at 65. The court noted that it previously had "made a special finding that the underlying offense was a violent offense under RCW 9.94A.030." CP at 65. The court also entered a conclusion of law that BLR

4

"present[ed]/continue[d] to present a substantial likelihood of repeating acts similar to the charged criminal behavior." CP at 68. In addition, the court found that BLR continued to be gravely disabled.

BLR appeals the trial court's 180-day recommitment order.

ANALYSIS

A.    LEGAL PRINCIPLES – INVOLUNTARY COMMITMENT

1.    Dismissal of Violent Felony Charges

RCW 10.77.050 states, "No incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." When the trial court determines that a person is incompetent to stand trial for felony charges, the charges against that person are dismissed without prejudice and the person must undergo a mental health evaluation for the purpose of filing a civil commitment petition. Former RCW 10.77.086(4) (2015).

For a person found incompetent to stand trial for felony charges under former RCW 10.77.086(4), the professional person in charge of a treatment facility may petition under RCW 71.05.280(3) for 180 days of treatment. RCW 71.05.290(3). RCW 71.05.280 states,

> [A] person may be committed for further treatment pursuant to RCW 71.05.320 if:
> . . .
> (3) Such person has been determined to be incompetent and criminal charges have been dismissed pursuant to RCW 10.77.086(4), and has committed acts constituting a felony, and as a result of a mental disorder, presents a substantial likelihood of repeating similar acts.
> . . .
> (b) For any person subject to commitment under this subsection where the charge underlying the finding of incompetence is for a felony classified as violent under RCW 9.94A.030, the court shall determine whether the acts the person committed constitute a violent offense under RCW 9.94A.030.

After this initial 180-day commitment term, under RCW 71.05.320(4) the person in charge of the facility in which a person is committed may file a new petition for involuntary

5

treatment on various grounds. One of the grounds involves a person committed under RCW

71.05.280(3):

> (c)(i) [If the committed person] [i]s in custody pursuant to RCW 71.05.280(3) and as a result of mental disorder or developmental disability continues to present a *substantial likelihood of repeating acts similar to the charged criminal behavior*, when considering the person's life history, progress in treatment, and the public safety.

> (ii) In cases under this subsection *where the court has made an affirmative special finding under RCW 71.05.280(3)(b)*, the commitment shall continue for up to an additional one hundred eighty day period whenever the petition presents prima facie evidence that the person continues to suffer from a mental disorder or developmental disability that results in a *substantial likelihood of committing acts similar to the charged criminal behavior*, unless the person presents proof through an admissible expert opinion that the person's condition has so changed such that the mental disorder or developmental disability no longer presents a substantial likelihood of the person committing acts similar to the charged criminal behavior.

RCW 71.05.320(4) (emphasis added.)

2. Gravely Disabled

A person also can be involuntarily committed if he or she is "gravely disabled." RCW

71.05.280(4). In addition, a person who currently is involuntarily committed for 180 days can be

recommitted involuntarily at the end of the commitment period for up to 180 days if he or she

continues to be gravely disabled. RCW 71.05.320(4)(d), (6).

Former RCW 71.05.020(22) defines "gravely disabled" as a condition in which a person,

because of a mental disorder:

> (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

This statute provides two alternative definitions of "gravely disabled," and either provides a basis

for involuntary commitment. *In re Det. of LaBelle*, 107 Wn.2d 196, 202, 728 P.2d 138 (1986).

B.   MOOTNESS

As a threshold matter, the State argues that this case is moot because BLR appealed only one of the two alternative grounds for the trial court's recommitment order and therefore we must affirm on the other alternative ground.  As a result, the State claims that we cannot provide effective relief even if we conclude that the trial court's finding that BLR was gravely disabled was not supported by substantial evidence.  We disagree.

A case is moot if we can no longer provide effective relief.  *In re Det. of M.W.*, 185 Wn.2d 633, 648, 374 P.3d 1123 (2016).  As a general rule, we do not consider cases that are moot or present only abstract questions.  *4518 S. 256th, LLC v. Karen L. Gibbon, P.S.*, 195 Wn. App. 423, 433, 382 P.3d 1 (2016).

BLR challenges only the trial court's order that he must be recommitted because he was gravely disabled under RCW 71.05.320(4)(d).  But the trial court also ordered that BLR must be recommitted because he continued to "present a substantial likelihood of repeating acts similar to the charged criminal behavior" under RCW 71.05.320(4)(c)(i).  BLR does not challenge that ground.  Therefore, we must affirm the trial court's commitment order on the unchallenged ground and we cannot grant BLR effective relief from that order.

However, an appeal of an involuntary commitment order based on the gravely disabled standard generally is not moot because an involuntary commitment order may have adverse consequences on future involuntary commitment determinations.  *In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012).  "[A] trial court presiding over future involuntary commitment hearings may consider . . . prior involuntarily commitment orders when making its commitment determination."  *Id.*

Here, it is possible that the trial court's finding that BLR was gravely disabled could be considered by other courts in future involuntary commitment hearings even though the trial court also ordered commitment on an alternative ground. Therefore, we conclude that this appeal is not moot and we address BLR's challenge to the trial court's conclusion that he was gravely disabled.

C.      INVOLUNTARY COMMITMENT BASED ON GRAVE DISABILITY

BLR argues that substantial evidence does not support the trial court's findings that he was gravely disabled under both of the two alternative definitions of former RCW 71.05.020(22). We disagree.

1.      Legal Principles

As noted above, former RCW 71.05.020(22) has two subsections that provide alternate definitions of "gravely disabled." Subsection (a) applies if the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." Former RCW 71.05.020(22)(a). Subsection (b) applies if the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." Former RCW 71.05.020(22)(b).

In a civil commitment proceeding, the State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. *M.W.*, 185 Wn.2d at 656. This standard means that the State must show that it is "highly probable" that the person is gravely disabled. *Labelle*, 107 Wn.2d at 209. On appeal, we "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *Id.*

2. Subsection (a) – Failure to Provide for Essential Human Needs

BLR argues that the State failed to provide clear, cogent, and convincing evidence that as a result of his mental disorder he was gravely disabled under subsection (a) of former RCW 71.05.020(22). We disagree.

a. Scope of Definition

Former RCW 71.05.020(22)(a) states that a person is gravely disabled if because of a mental disorder he or she "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." The risk of danger of serious physical harm must be "substantial." *LaBelle*, 107 Wn.2d at 204. But there is no requirement that the danger of harm be "imminent" because the effect of care and treatment received in a hospital usually will eliminate the imminence of the danger. *Id.* at 203.

Under subsection (a), danger of harm need not be evidenced by recent, overt acts. *Id.* at 204. Instead, the danger usually arises from passive behavior, such as when a person fails or is unable to provide for his or her essential needs. *Id.* at 204-05.

> [T]he State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

*Id.*

"[U]ncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital." *Id.* at 210. The State must show that the person's mental condition "render[s] him unable to make a rational choice with respect to his ability to care for his essential needs." *Id.* A key question is whether the person is able to "form realistic plans for taking care of himself outside the hospital setting." *Id.*

b. Analysis

The State presented evidence that if released, BLR would fail to provide for the essential human needs of medical treatment and housing. Dr. Sutton testified that her professional opinion was that because of BLR's mental disorder, he would discontinue taking his medication and receiving mental health treatment upon his release. These opinions are supported by evidence that BLR (1) did not believe that he had a mental disorder; (2) took his medication only to get out of WSH; (3) was suspicious of treatment providers, had poor insight with regards to his symptoms, and possibly had paranoid ideations; and (4) continued to have poor judgment regarding how to take care of his mental health symptoms.

The State also produced evidence that BLR's failure to seek medical care would cause a substantial risk of danger of serious physical harm. Dr. Sutton testified that because of BLR's mental disorder, it was unlikely that he would be able to consistently meet his basic health and safety needs if released from the hospital, and that given his history, he would likely rapidly decompensate. She also expressed a belief that it was highly likely that BLR would self-medicate through substance abuse upon his release from the hospital. BLR would especially have difficulty obtaining housing because he did not believe he had a mental disorder and refused to obtain services like social security that would help him maintain necessities like housing, food, and clothing, or to reside with family members.

BLR argues that the State failed to provide "recent, tangible" evidence that he was unable to provide for his essential human needs. *LaBelle*, 107 Wn.2d at 204-05. He points to Dr. Sutton's testimony that BLR had recently improved in his ability to control his thoughts and behavior within in a controlled environment, was taking his medications, and that his attendance and participation in treatment groups had greatly improved.

10

However, Dr. Sutton testified that BLR only took his medication to get out of WSH. BLR testified that if released he would go back to taking the injectable medication he had been taking while living with his father. His plan to seek mental health treatment upon release was vague because he could not remember his former provider's name and believed the provider had shut down his practice. BLR also testified that if released, he would investigate living at a homeless camp, but did not want to go to a mental health group home and did not know how to find a standard apartment.

We hold that the State presented substantial evidence of grave disability under former RCW 71.05.020(22)(a).

3. Subsection (b) – Deterioration in Functioning/Failure to Receive Essential Care

BLR argues that the State failed to provide clear, cogent, and convincing evidence that as a result of his mental disorder he was gravely disabled under subsection (b) of former RCW 71.05.020(22). We disagree.

a. Scope of Definition

Former RCW 71.05.020(22)(b) states that a person is gravely disabled if, because of a mental disorder, he or she "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." This definition has two separate requirements: (1) a severe deterioration in routine functioning and (2) failure to receive treatment that is essential for health or safety. *LaBelle*, 107 Wn.2d at 205. The legislature added this subsection in 1979 to broaden the scope of the involuntary commitment standards. *Id.* at 205-06.

11

Subsection (b) is designed permit the State to "treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.' " *Id.* at 206 (quoting Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 YALE L. & POL'Y REV. 395, 410 (1985)). However, people cannot be involuntarily committed "solely because they are suffering from mental illness and may benefit from treatment." *LaBelle*, 107 Wn.2d at 207.

Regarding the first requirement, the State must provide recent proof of "significant" loss of cognitive or volitional control. *Id.* at 208. Regarding the second requirement,

> the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*Id.* The person must be "unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.*

> b.    Analysis

The State presented evidence of BLR's severe deterioration in routine functioning that reflected a significant loss of cognitive or volitional control. BLR previously had been admitted to WSH four times before the admission at issue. He violently assaulted his father in December 2017. Dr. Sutton testified that BLR continued to exhibit suspiciousness, poor insight with regards to his symptoms, and possibly paranoid ideations. As of late October 2018, there were reports that BLR was still "responding to internal stimuli" and having "some mood lability and

agitation." He continued to have poor judgment regarding how to take care of his mental health symptoms.

The State also presented evidence that BLR would not receive essential care for his health and safety if released from the hospital. BLR had been diagnosed with schizoaffective disorder and unspecified personality disorder with antisocial personality disorder traits. BLR did not believe he had a mental illness or have good insight regarding his condition, and Dr. Sutton did not think that he would continue taking medication outside the controlled environment of the hospital. Dr. Sutton was also concerned that BLR would abuse illicit substances if released, which he had a history of doing.

BLR testified that he did not believe he had a mental illness. If released, BLR wanted to go back to taking the injectable medication he had been taking while living with his father. His plan to seek mental health treatment upon release was vague because he could not remember his former provider's name and believed the provider had shut down his practice. BLR did not want to be on social security if released because the monthly check was not enough to live on. Instead, he would investigate living at a homeless camp, but did not want to go to a mental health group home and did not know how to find a standard apartment.

In *Labelle*, the Supreme Court held the appellant's inability to understand his need for treatment and the likelihood he would not, if released, take the medication necessary to stabilize his mental deterioration tended to show that hospital treatment was essential to his health and safety. 107 Wn.2d at 213. In *In re Detention of RH*, this court affirmed the trial court's finding of grave disability where the appellant was unable on his own to obtain medical treatment sufficient to stabilize his mental condition unless he was involuntarily hospitalized. 178 Wn.

App. 941, 947, 316 P.3d 535 (2014). Here, BLR demonstrated a lack of understanding about his need for medication as well as his need for mental health services and stable housing.

We hold that the State presented substantial evidence of grave disability under former RCW 71.05.020(22)(b).

## CONCLUSION

We affirm the trial court's 180-day recommitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

LEE, C.J.

SIDDOWAY, J.

14