# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Detention of:<br><br>J.M.,<br><br>                          Appellant. | No. 48752-7-II<br><br>UNPUBLISHED OPINION |

LEE, J. – J.M.[1] appeals the jury's finding that he is gravely disabled. We hold that the State presented sufficient evidence under RCW 71.05.020(17)(a) to support the jury's finding that J.M. was gravely disabled. Accordingly, we affirm.

## FACTS

In March 2015, the trial court signed a 90-day involuntary treatment order for J.M. at Western State Hospital (WSH). In June 2015, the trial court ordered an additional 180-day involuntary treatment based on its finding that J.M. was gravely disabled.

In November 2015, two of J.M.'s doctors petitioned for a second 180-day involuntary treatment, arguing that J.M. continued to be gravely disabled. In support of the petition, Dr. William Crinean, a clinical psychologist, and Dr. Kamran Naficy, a psychiatrist, asserted that J.M. was still schizophrenic and "gravely disabled" but "ready for a less restrictive alternative placement." Clerk's Papers (CP) at 22. J.M. exercised his right to a jury trial to determine whether he continued to be gravely disabled.

---

[1] Under General Order 2017-1 of Division II, *In re Changes to Case Title*, available at: http://www.courts.wa.gov/appellate_trial_courts/, an appeal from an involuntary commitment proceeding will use the person's initials instead of his or her name. We mean no disrespect.

At trial, Dr. Crinean testified that based on his observations and review of J.M.'s history, J.M. had schizophrenia and obsessive-compulsive disorder. According to Dr. Crinean, J.M.'s symptoms included delusional thinking, responding to internal stimuli (exhibited by mumbling, talking or laughing to himself), suspiciousness, and an unwillingness to acknowledge his behavioral issues. J.M. also exhibited obsessive and repetitive behaviors, such as washing his hands so frequently that they became chapped. Dr. Crinean also explained that when J.M was last in the community, he did not use the heat in the home, plugged the toilet and then filled it with waste, wandered around the house in his underwear, and had mostly spoiled and inedible food in the kitchen.

Dr. Crinean further testified that while at WSH, J.M. had been taking his medication regularly, and his appearance and hygiene had been good; but "[w]hat becomes problematic is that he won't take his medications; so as his medications leave his body, his ability to manage these things rationally will erode. He'll start neglecting his care." Verbatim Report of Proceedings (VRP) (Mar. 23, 2016) at 67. Dr. Crinean's opinion was that J.M.'s lack of insight and refusal to acknowledge the need for medications placed him at risk of failing to care for his essential health and safety needs. Dr. Crinean recommended a less restrictive placement; however, he was not confident that J.M. would take his medication in a group home setting and "believe[d] that he will stop his medication at the first available opportunity." VRP (Mar. 23, 2016) at 86. Dr. Crinean felt an additional 180-day treatment order and release to a group home would be beneficial.

Dr. Naficy agreed with Dr. Crinean's diagnosis that J.M. suffers from schizophrenia and obsessive-compulsive disorder. Dr. Naficy expressed concern about J.M.'s refusal to acknowledge his mental illness issues. If released to the community without supervision, Dr. Naficy believed

J.M. would stop taking medications, rapidly deteriorate, and become homeless. Dr. Naficy believed another 180-day order with the possibility of a conditional release was beneficial.

J.M. testified on his own behalf. J.M. testified he did not believe he had schizophrenia or obsessive-compulsive disorder and did not suffer from delusions or hallucinations. He also testified he does not see any difference between when he takes his medication and when he does not. When asked about his plans if released, J.M. testified he had money saved but was unsure how long it would last. He also stated he would find a job, but he admitted that he had no employment history, had never done a job search, and had no job training. Regarding where he would live, J.M. testified he would not live with his mother but would live with one of his "many aunts and uncles" throughout the state. VRP (Mar. 24, 2016) at 188.

The jury found that J.M. suffered from a mental disorder, that he was gravely disabled as a result of that mental disorder, and that a less restrictive alternative to confinement at WSH was in his best interest. On March 25, 2016, based on the jury's verdict, the trial court ordered that J.M. be detained for up to 180 days while a less restrictive alternative placement is arranged.[2] J.M. appeals the jury's finding that he is gravely disabled.[3]

---

[2] In April 2016, J.M. was released from WSH to a less restrictive alternative placement.

[3] Our record also contains a notice of appeal filed in June 2015, appealing the trial court's first 180-day involuntary commitment order. Neither party addresses this order in the argument section of their briefs; therefore, the appeal of the June 2015 order is considered abandoned.

ANALYSIS

J.M. argues the State failed to present sufficient evidence that he was gravely disabled under either of the two alternative definitions in RCW 71.05.020(17). We disagree.

Where sufficiency of the evidence is challenged, we review the facts in the light most favorable to the prevailing party. *In re Det. of Kelley*, 133 Wn. App. 289, 295, 135 P.3d 554 (2006), *review denied*, 159 Wn.2d 1019 (2007). In an involuntary commitment proceeding, the State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. RCW 71.05.310; *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). This standard means that the State must show that it is "highly probable" that the person is gravely disabled. *Id.* (quoting *In re Pawling*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).

"Gravely disabled" is defined as:

> a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety

RCW 71.05.020(17). The reviewing court will not disturb the trier of fact's finding of "gravely disabled" if it is "supported by substantial evidence." *Labelle*, 107 Wn.2d at 209. Commitment is justified if the "gravely disabled" standard is met under either prong of RCW 71.05.020(17)(a) or (b). *Id.* at 202.

A.    SUBSTANTIAL EVIDENCE SUPPORTS RCW 71.05.020(17)(a)

The first prong requires a showing that an individual is "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW

71.05.020(17)(a). "[T]he State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *LaBelle*, 107 Wn.2d at 204-05. "[T]he failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors." *Id.* at 205.

Here, Dr. Crinean and Dr. Naficy testified that J.M. had schizophrenia and obsessive-compulsive disorder. According to Dr. Crinean, J.M.'s symptoms included delusional thinking, responding to internal stimuli (exhibited by mumbling, talking or laughing to himself), suspiciousness, and an unwillingness to acknowledge his behavioral issues. J.M. also exhibited obsessive and repetitive behaviors, such as washing his hands so frequently that they became chapped. When J.M was last in the community, he did not use the heat in the home, plugged the toilet and then filled it with waste, wandered around the house in his underwear, and had mostly spoiled and inedible food in the kitchen. Dr. Crinean testified that his primary concern was that, if J.M. was released, his lack of insight and denial of the need for medications would lead him to stop taking medications, his condition would deteriorate, and he would not be able to take care of his basic needs. Dr. Naficy testified that his most immediate concern was that J.M. would be homeless.

J.M. testified that he was unsure how much money he had, he had no employment history, and he did not have a clear plan of where to live. J.M. also refused to acknowledge his mental disorders or the need for medication.

No. 48752-7-II

Based on the above, the State presented tangible evidence of J.M.'s failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment because of his mental disorder, which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded based on J.M.'s mental disorder. Accordingly, the State presented sufficient evidence to clearly, cogently, and convincingly show that J.M. was gravely disabled under RCW 71.05.020(17)(a). Accordingly, we affirm the jury's verdict.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

 

Lee, J.

We concur:

Worswick, J.

Bjorgen, C.J.

6