# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | No. 77555-3-I |
| | ) | |
| C.B., | ) | DIVISION ONE |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 18, 2019 |
| | ) | |

MANN, J. — C.B. was civilly committed for up to 14 days of involuntary inpatient mental health treatment following a self-inflicted gunshot wound to the head. The trial court found that an involuntary commitment was warranted because C.B. presented a likelihood of serious harm to himself and was not a good faith volunteer patient. C.B. appeals. We affirm.

I.

C.B. was admitted to the Harborview Medical Center (Harborview) on October 7, 2017 due to a self-inflicted gunshot wound to the head.[1] While at the hospital, resident psychiatrist Dr. Anna Sunshine spoke with C.B. about psychiatric treatment. C.B. expressed his desire to leave the hospital and get voluntary treatment but Dr. Sunshine

---

[1] The parties debate whether this gunshot wound was a deliberate suicide attempt or merely an accident.

decided involuntary treatment was the best course to pursue. After informing C.B. that she would be recommending involuntary treatment, C.B. got upset, "was really frustrated, punched the bed really hard . . . and yelled at [Dr. Sunshine] and wanted [Dr. Sunshine] to get out of the room."

C.B. remained in the hospital and continued to be visited by psychiatric staff. On October 15, 2017, Designated Mental Health Professional Natasha McKinnon filed a Petition for Initial Detention to hold C.B., and on October 17, 2017, Harborview filed a 14-day petition for involuntary treatment for C.B. The trial court held a probable cause hearing on the petition the next day. The court heard the testimony of three witnesses: Dr. Sunshine, Gina Ferrari, a licensed clinical social worker, and C.B. C.B. was present in court throughout the hearing.

Dr. Sunshine testified about her conversations with C.B. She testified that C.B. told her that when he was handling the gun that shot him "[m]aybe at that moment I didn't care as much if I lived or died." Dr. Sunshine noted that she was very concerned "about how potentially lethal [C.B.'s] attempt was[,] . . . his statements of passive suicidality, and . . . [that] he wasn't being completely upfront with" her. Further, Dr. Sunshine explained that "it seemed like [C.B.] was really eager to convince me that everything was okay. He said his mood was good, but then at times during the interview he seemed sad, and he seemed like there was more going on beneath the surface that he didn't want to discuss with me."

Ferrari testified that she had reviewed C.B.'s files and met with C.B. the day before the hearing. Ferrari noted that C.B. had a working diagnosis of "unspecified

depressive disorder with a history of post-traumatic stress disorder." Ferrari also read notes from C.B.'s medical chart into the record.

Finally, C.B. testified that he "would like to go to psych. [He has] been tired of waiting on the medical unit[,]" and that he wanted to "[g]et the help I need." On cross-examination, when asked if he had a mental or emotional disorder, C.B. responded "I am not a professional; therefore, I cannot diagnose myself." When asked what he would do if he disagreed with the recommendation of his physician, C.B. responded "I don't think I would disagree." But when the State pointed out C.B.'s working diagnosis, C.B. responded "I haven't been given a clear understanding of why that diagnosis has been made and who it's been made by."

After hearing from the witnesses, the court granted Harborview's petition to commit C.B. for up to 14 days. The court first recapped the testimony it heard. C.B. "was very eager to leave the hospital, very frustrated with how long it had taken to get a voluntary psychiatric bed, made it clear that he wanted to leave, and made it clear that he was frustrated." The court described C.B.'s statements about voluntary treatment as wavering, where sometimes he would be very willing to stay, other times he presented as paranoid, and still other times he was frustrated and wanted to leave. The court also had "some concerns that [C.B.'s] memory issues do appear to be somewhat selective."

Ultimately the court found that C.B. had a mental and emotional impairment and as a result "present[ed] a substantial [ongoing] risk of serious harm to himself, as evidenced by attempts to commit suicide or inflict physical harm on himself." The court also determined that C.B. was not a good faith voluntary patient.

-3-

In supplemental findings of fact and conclusions of law, the court found the testimony of Dr. Sunshine and Ferrari to be credible. The court also found the testimony of C.B. to be "credible in the sense that he was making efforts to clearly explain his position to the court. However, the court gave reduced weight to the testimony of [C.B.] and found that his testimony had been impacted by significant and ongoing symptomology."

Nine days later, on October 27, 2017, Harborview filed a petition to continue C.B.'s involuntary commitment for up to an additional 90 days.[2] C.B. was then released from inpatient treatment on November 2, 2017; 16 days after the trial court granted the petition to involuntary commit C.B.

## II.

Before a trial court can order a 14-day involuntary civil commitment, the petitioner must first prove by a preponderance of the evidence that the subject of the petition presents a likelihood of serious harm to himself or others and has not in good faith volunteered for treatment. In re Detention of LaBelle, 107 Wn.2d 196, 214, 728 P.2d 138 (1986); RCW 71.05.230; RCW 71.05.240 ("If [a] court finds by a preponderance of the evidence that such person, as a result of a mental disorder . . . presents a likelihood of serious harm . . . [and no less restrictive] alternatives are in the best interest of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed fourteen days.").

Our review of the trial court's order is limited. "Where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence

---

[2] The disposition of this petition is not in the record, but we assume that it was granted since C.B. was released from Harborview more than 14 days after the initial involuntary commitment order.

-4-

supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." H.N., 188 Wn. App. at 762. "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person of the truth of the declared premise." H.N., 188 Wn. App. at 762.

A.

C.B. argues that there was insufficient evidence for the trial court to find that C.B. presented a likelihood of serious harm to himself. We disagree.

Likelihood of serious harm is defined as:

> (a) A substantial risk that: (i) Physical harm will be inflicted by a person upon his or her own person, as evidence by threats or attempts to commit suicide or inflict physical harm on oneself; . . .
> (b) The person has threatened the physical safety of another and has a history of one or more violent acts;

RCW 71.05.020(35).

The trial court determined that C.B. had an ongoing substantial risk of serious harm to himself. The court noted that C.B. "harmed himself in a way that could have very clearly been lethal." "[A]t times, in the hospital [C.B.] has admitted he had to do it to protect himself or other people. At other times he admitted to recklessness or hopelessness, and at other times described it as accidental." Further, C.B. "has also been very labile and impulsive, and that impulsivity causes the Court great concern in terms of his future safety."

Written statements from C.B.'s medical chart support the trial court's conclusion:

> [From Dr. Sunshine:] [C.B.] no longer endorses active or passive suicidal ideation . . . .However, given the severity of his presentation and ongoing paranoia, there is a high likelihood that he is minimizing or understating his symptoms.
>     . . . .

A. Chronic risk factors, including sex, history of childhood trauma, depressive illness, PTSD, history of violent behavior, history of legal issues, and; B. acute risk factors, including unemployment, homelessness, severe hopelessness and guilt, substance use, possible psychosis, family estrangement and lack of social support.

. . . .

[From Dr. Jong:] [C.B.] denies any suicidality, saying, quote, I have a new lease on life, end quote. He continues to deny that shooting himself was actually a suicide attempt, but does say, quote, I didn't care what happened, end quote.

. . . .

[C.B.] continues to be paranoid today, though grossly oriented to place, date and situation. He asked me directly, quote, are you going to kill me, end quote, when I introduced myself as being from psychiatry team.

C.B. argues that H.N. supports his contention that there was insufficient evidence to find that C.B. presented with a likelihood of serious harm. In H.N., this court determined that there was sufficient evidence to support the trial court's conclusion that H.N. presented a likelihood of serious harm to herself. 188 Wn. App. at 762. The court determined that testimony from H.N.'s two roommates and doctor, coupled with screenshots of H.N's text messages from the night of her suicide attempt, supported the court's conclusions. H.N., 188 Wn. App. at 763.

C.B. appears to argue that based on H.N., the State was required to submit evidence about what occurred prior to C.B.'s gunshot wound to show that he in fact attempted suicide. Further C.B. argues that the State was required to provide testimony from people with personal knowledge about C.B.'s prior mental health from which the court could assess a likelihood for future harm.

But just because the H.N. court relied on that evidence to support its findings does not make similar evidence prerequisites to such a finding. Rather, here, the trial court considered statements made by C.B. to various healthcare providers to support its finding that C.B. presented with a likelihood of serious harm. This was not in error.

Further, C.B. argues that there was insufficient evidence to show that he actually attempted suicide. But, even if true, a likelihood of serious harm includes more than just a suicide attempt. It can also be found with "[a] substantial risk that . . . [p]hysical harm will be inflicted by a person upon his or her own person, as evidence by threats . . . to commit suicide or inflict physical harm on oneself." RCW 71.05.020(35).

The record is clear that C.B., even if it was not a suicide attempt, previously inflicted serious physical harm upon himself and has not clearly expressed any concern about that. Rather, the record is replete with statements by C.B. about how he doesn't care whether he lives and with statements from health care providers about their concerns of C.B.'s mental health. For example, "[C.B.] stated he wanted to blow his brains out [on the night he shot himself] . . . and made comments to Dr. Sunshine about being broken saying that no one can fix him.". Further, the trial court noted that "there's been a lot of underlying paranoia that he needed to harm himself to save other people." This indicates that even if his gunshot wound was not a suicide attempt, there is still a substantial risk that C.B. will inflict physical harm upon himself in the future.

Taken together, the evidence offered to the court about C.B.'s mental state was sufficient to persuade a fair-minded rational person that C.B. had a likelihood of inflicting harm against himself. H.N., 188 Wn. App. at 762. Therefore, there was sufficient evidence to support the trial court's findings.

B.

C.B. argues that there was insufficient evidence for the trial court to find that he was not a good faith voluntary patient. We disagree.

To qualify as a good faith voluntary patient, the individual must (1) express a willingness to abide by the procedures and treatment plan prescribed by the facility and professional staff and (2) have a track record which does not belie the individual's stated intent. Chorney, 64 Wn. App. at 479. The trial court found C.B. was not a good faith voluntary patient. The court noted that C.B. "has been somewhat ambivalent about whether he needs psychiatric care or would benefit from psychiatric care." Further, C.B. "has made a number of statements about wanting to leave. He has made statements that he believes treatment would not be helpful . . . . His ongoing impulsivity . . . causes the Court great concern that he would not, in fact, continue to be a good-faith voluntary patient."

Written statements from C.B.'s medical chart, support the court's conclusion:

[From Dr. Sunshine:] [C.B.] states he does not know what he would work on during [voluntary inpatient psychiatric admission]. He states that he feels, quote, good. He says the most helpful thing for him would be if we could somehow change events that have happened in his past. Today [C.B.] is again ambivalent about inpatient psychiatric admission . . . [C.B.] continues to minimize his self-inflicted gunshot wound, his drug use, and his mood symptoms . . . . [C.B. made] statements reflecting hopelessness, quote, you can't fix me, end quote.

. . . .

[From Nurse Kaufman:] [C.B.] was very elusive with his explanation of what brought him into the hospital . . . . Patient was upset, swearing, throwing things around the room. He later agreed with the MDs that he would stay voluntarily. After they left, he told staff, quote, I may change my mind, end quote.

Further, C.B. "state[d] multiple times that he does not need any psychiatric help or treatment. . . . we attempted voluntary and that was unsuccessful due to [C.B.'s] continued requests to discharge and multiple statements that he does not need any form of psychiatric help." "[C.B.] seemed hopeless stating 'you can't fix

-8-

me.' [C.B.] was unwilling to commit to a voluntary psychiatry admission today [October 15] stating he was 'bored.'"

In Chorney, this court found that the trial court did not err in finding that Chorney was not a good faith voluntary patient. The court reasoned that "[a]lthough Chorney voluntarily presented himself for admission to Harborview initially, he objected to his prescribed treatment and became so agitated and threatening that he had to be placed in restraints." Chorney, 64 Wn. App. at 479. "Chorney's impaired insight into his behavior, together with his recent violent behavior, negated any possibility that Chorney would be found to be a good faith voluntary patient." Chorney, 64 Wn. App. at 479.

Similarly here, although C.B. asserts that he is a good faith voluntary patient, the facts indicate otherwise. Although C.B. was never restrained, C.B. made numerous statements about wanting to leave the hospital, made statements that psychiatric treatment would be unhelpful or that hospital staff were trying to kill him, and exhibited ongoing impulsivity in regards to his treatment. C.B. has not expressed a clear willingness to abide by his treatment recommendations and has a track record that belies his expressed intent.

C.B. argues that In re Detention of Kirby, 65 Wn. App. 862, 829 P.2d 1139 (1992), supports his assertion that he was a good faith voluntary patient. In Kirby, this court found that "the evidence produced by the State was insufficient to show by a preponderance of the evidence that Kirby was unfit for voluntary treatment." 65 Wn. App. at 872. The State had "offered the petition for 14-day involuntary treatment . . . [which stated] Kirby was not a good faith voluntary patient merely [because] she . . . is too impulsive." Kirby, 65 Wn. App. at 869-70. The State also "relied on the testimony of

an emergency room social worker . . . that Kirby stated she took an overdose because of thoughts of having to kill a child, and that Kirby had vacillated about taking her medication and coming to the hospital." Kirby, 65 Wn. App. at 870. The court determined that although "this record certainly justifies a conclusion Kirby was ill, we fail to see how any of it relates to the question of whether she could be considered a good faith voluntary patient." Kirby, 65 Wn. App. at 870.

Kirby does not offer C.B. the support he desires. The court reasoned that Kirby voluntarily sought mental health treatment initially, and that "the record from the . . . hearing contains repeated lucid and rational assurances by Kirby that if released she would see her psychiatrist, follow his advice . . . and contact her doctor . . . if she sensed a recurrence of mental disturbances." Kirby, 65 Wn. App. at 870. Here, however, the record does not contain similar assurances by C.B. Instead, C.B. became violent and aggressive when told that Dr. Sunshine was recommending involuntary treatment, changed his mind about voluntary treatment several times, declined to agree with his working diagnosis, and was ambiguous about following through with treatment recommendations.

The evidence offered on C.B.'s vacillations and whether he was truly interested in obtaining mental health treatment were sufficient to persuade a fair-minded rational person that C.B. was not a good faith voluntary patient. H.N., 188 Wn. App. at 762. Therefore, there was sufficient evidence to support the trial court's findings.

We affirm.

_____Mann, J._____

WE CONCUR:

_____Leavell, J_____                    _____Appelwick, CJ_____