# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | No. 80104-0-I |
| | ) | |
| B.K., | ) | DIVISION ONE |
| | ) | |
| Appellant. | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | FILED: September 23, 2019 |

MANN, A.C.J. — B.K. appeals a 180-day civil commitment order entered by the trial court on May 31, 2018. B.K. contends that the State presented insufficient evidence to support the court's finding that she was gravely disabled. We agree and reverse.

I.

On May 24, 2018, the State filed a petition to continue B.K.'s commitment at Western State Hospital for an additional 180 days of treatment. On April 26, 2016, B.K. fell on her face and sustained facial fractures, while living at home. B.K. went to Harborview Medical Center where she became agitated, uncooperative, and combative. On April 29, 2016, B.K. was transferred to Kitsap Adult Intensive Care Unit and on June 1, 2016, admitted to Western State Hospital on a 90-day revocation from Clallam

County. Following the entry of four 180-day commitment orders, B.K. has remained at Western State since her initial commitment in May 2016. Prior to B.K.'s hospitalization at Western State Hospital, she was hospitalized in Washington and Indiana and estimated she has been hospitalized approximately 20 to 30 times since her 20s. B.K. is now in her 50s.

During the hearing on B.K.'s involuntary treatment in May 2018, the State relied on the testimony of Dr. Linda Thomas. Dr. Thomas was part of B.K.'s treatment team. Dr. Thomas indicated that B.K.'s diagnosis was schizoaffective disorder, bipolar type. B.K.'s diagnosis affects her thinking process and mood symptoms. Particularly, her thinking process is not based in reality, she talks about being telepathically assaulted, and has accused staff and others of assaulting her. Investigations showed those allegations were not true. B.K.'s mood symptoms include mood lability, different mood changes, occasional anger, and behavioral episodes.

Dr. Thomas indicated that B.K. shows some understanding and insight into her mental health, but does not understand "the level at which the problems have impacted her behavior or how they impact others." Speaking to her judgment skills, Dr. Thomas noted she sometimes exhibits good judgment and her judgment has improved over her hospitalization, B.K. is more invested in treatment, and she has been participating better. B.K.'s judgment as to her medication is sometimes "not as good as it should be since she's declined in the past taking medication that is to her benefit." B.K. also struggled with "working with the treatment team and developing a discharge plan."

Dr. Thomas believed that, despite B.K.'s mental disorder, B.K. may be able to meet all her health and safety needs in the community if she were released. After

-2-

further questioning about whether B.K. would need assistance with activities or daily living, or would be at risk of serious physical harm because she would not be capable of finding food, shelter, or housing, Dr. Thomas responded that "I think [B.K.] is resourceful enough in the community that she could probably get her basic needs met."

Dr. Thomas indicated that B.K. was not on involuntary medication, but was on medication watch because there had been an incident six months earlier where B.K. was observed putting medicine in her pocket.[1] Dr. Thomas also indicated that B.K. was actively participating in group treatment and was supportive of her peers. But Dr. Thomas did not believe that B.K. would be capable of making rational decisions to direct her own treatment outside of a structured setting. If B.K. were released, Dr. Thomas believed that she would not follow through with her medications because when B.K. was initially admitted she was only taking a "natural substance," not her prescribed medication and had spoken about wanting to reduce her medication. Dr. Thomas opined that "it's likely that she would deteriorate in her functioning, and because of that would come to the attention of mental health providers and maybe end up back in the hospital."

Regarding future release, Dr. Thomas believed that continued hospitalization would be most appropriate until the treatment team had a plan for discharge, which would include housing, mental health services, and a support system. B.K. also needed to show more consistent behavioral control and a willingness to work with the treatment team on a discharge plan.

---

[1] This hearsay evidence was admitted not for the truth of the matter, but as a basis for Dr. Thomas's medical opinion.

The court found clear, cogent evidence that B.K. was gravely disabled under both RCW 71.05.020(22)(a) and (b) and committed B.K. to 180 days of involuntary commitment. The court concluded that,

> if she were discharged, she would likely deteriorate, due to her lack of medication compliance and realistic plan for discharge. She would need housing, mental health services and a support system in place, before [B.K.] is ready for discharge. She needs more consistent behavioral controls, which have improved recently, and a willingness to work with the Social Worker on a discharge plan.

B.K. timely appeals.

## II.

B.K. contends that the State presented insufficient evidence to support a 180-day involuntary commitment on the basis of grave disability. We agree.

## A.

The burden of proof necessary at a 180-day commitment proceeding is by clear, cogent, and convincing evidence. In re Detention of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Thus, the ultimate fact in issue must be shown by highly probable evidence. Id. When the trial court has weighed the evidence, our review is generally "limited to determining whether substantial evidence supports the findings, and if so, whether the findings in turn support the trial court's conclusions of law and judgment." Id.

An individual may be involuntarily committed for mental health treatment if, as a result of a mental disorder, the individual either (1) poses a substantial risk of harm to him or herself, others, or property of others, or (2) is gravely disabled. Id. at 201-02.

Here, the trial court ordered B.K.'s involuntary commitment under the gravely disabled standard.

"Involuntary commitment for mental disorders is a significant deprivation of liberty which the State cannot accomplish without due process of law." LaBelle, 107 Wn.2d at 201. The State must prove by highly probable evidence that an individual is gravely disabled, as a result of a mental health disorder, if he or she is either "(a) in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(22). Here, the court indicated that B.K. was gravely disabled under both alternatives.

Under RCW 71.05.285, prior history of decomposition and discontinuation of treatment resulting in repeated hospitalizations is evidence which "may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety." The State, however, is still required to prove that the individual is currently suffering from a mental health disorder that meets the gravely disabled standard. LaBelle, 107 Wn.2d at 204-05, 208.

B.

The trial court made the following findings of fact and conclusions of law:

> The Court was advised of the Respondent's prior hospitalizations and detentions as follows:
> Per Testimony of Petitioner and Declaration in Support of Petition. Respondent was hospitalized in Indiana in 2006, 2007, 2013, and 2014 per self report. This is her 2nd admission to Western State Hospital

(WSH) on 6/1/2016, following a 90 day commitment from Clallum [sic] County WA for "grave disability". She had fallen which resulted in her admission to Harborview Medical Center where she broke her facial bones. Her first admission to WSH was on 4/22/2014.

The Respondent's current mental status examination reveals: Medication rights were given and wishes respected. For court hearing, doctor reviewed the mental health records of Respondent, spoke to treatment team, reviewed staff and chart notes, and personally observed and evaluated the Respondent. Respondent suffers from a mental disorder characterized by the following symptoms: She has good hygiene. She presented as calm and polite, but guarded around certain questions. She talks about being telepathically assaulted by staff. She has mood symptoms which are not well controlled, including mood lability. She has limited insight, understands she has a mental illness, she believes her behaviors are related to her medications. Her judgment varies. She has declined taking medications in the past that are for her benefit.
She can be out of control issues, and her judgment around that is not in her best interests. By records she had to be escorted to seclusion on 2 occasions due to her out-of-control behaviors. She can be calm in groups, interspersed with loud, disruptive and demanding behaviors. These behaviors seem to be unpredictable. In the community she may have enough resources to get her basic needs met. Per observation and chart notes, she has variable episodes of poor volitional control, emotional instability, being hyper verbal, talking about various topics loudly, intrusive toward peers and their business, verbally demeaning to staff (e.g. medication nurse), requiring redirection. She is often screaming, disruptive and yelling at peers. She is on medication watch at the present time, it was documented that it was unclear whether she was taking her meds. She was observed placing her medication into her pockets per staff notes. If she were discharged, she would likely deteriorate, due to her lack of medication compliance and realistic plan for discharge. She would need housing, mental health services and a support system in place, before Respondent is ready for discharge. She needs more consistent behavioral controls, which have improved recently, and a willingness to work with the Social Worker on a discharge plan.

Cross-exam of Dr. Linda Thomas by DAC: ADL's are good. She was able to get herself to Washington from Indiana. She is oriented. She is intelligent. She has limited insight into her mental illness. She is making progress. She has not been in restraints within the past 6 months.

Further, based on the petition and testimony of Petitioner, the Respondent:

Respondent testified as follows: I am ready for discharge. I understand I have enough clothing. Psychologically, I'm ready to leave, as soon as my housing is arranged. I would like to go to Port Angeles. I'm taking a generic of Zyprexa which I would continue taking if ordered. I

have additional medical concerns I want to be addressed. I would be willing to work with a "Guardian" if one is appointed. I think I have more than $3000 and would need to be bonded if I had a "Guardian." I'm ready to offer my services for employment. I came ill prepared with questions at this time.

Cross-exam of Respondent by the State: Did you refuse medications within the past 6 months? "Yes", and my behavior was wrong. In years past, I stopped taking my medications in the community. Do you have a debt related to your housing in Port Angeles? "I asked several months into my stay at WSH that my disability be used to erase that debt, so I shouldn't have a debt." "I have always signed releases of information. And if asked again, I will sign them."

Re-direct of Respondent by DAC: "I've learned patience at WSH." "I'm ready to take care of myself in the community."[2]

As a threshold matter, the trial court included in its findings of facts and conclusions of law, facts that were presented only in the State's petition and not elicited from Dr. Thomas during the hearing. Findings of fact must be supported by substantial evidence. LaBelle, 107 Wn.2d at 209. The findings emphasized above were not supported by testimony at the hearing and thus are erroneous and not part of our analysis of whether the State presented sufficient evidence of B.K.'s grave disability.

C.

B.K. contends that the State failed to prove that she continued to be gravely disabled under RCW 71.05.020(22)(a).

Under the first alternative, the petitioner

must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

LaBelle, 107 Wn.2d at 204-05; RCW 71.05.020(22)(a).

---

[2] (Emphasis added.)

Here, there is insufficient evidence to support the court's finding that B.K. would be unable to provide for her essential needs as a result of her mental disorder and that this failure will result in a high probability of serious physical harm. The State failed to prove that B.K. would be unable to provide for her food, clothing, and shelter. When Dr. Thomas was asked, if released, would B.K. be at risk of serious physical harm because she would not be able to find food, shelter, and housing, Dr. Thomas responded "I think there's some risk there but I also think she's very capable of finding what she needs to address some of those things." When asked to repeat her answer, Dr. Thomas responded that "in the community [B.K. would] probably be able to be resourceful enough to get her basic needs met."

The State also failed to provide recent, tangible evidence that there was a high probability that B.K. would stop taking her medication that and as a result, she would suffer serious physical harm within the near future. At the time of the hearing, B.K. was not on involuntary medication, but was on medication watch because six months earlier, B.K. was observed putting medication in her pocket.

When Dr. Thomas was asked whether B.K. would be able to direct her own treatment outside of a structured setting, Dr. Thomas responded that B.K. was not capable of directing her own medical treatment. The basis for Dr. Thomas's opinion was that when B.K. was admitted "[s]he was taking a natural substance, not prescribed medication, and she had spoken about wanting to reduce her medication." Dr. Thomas's opinion was not based on recent observations, rather it was based on observations from 2016. When asked if she would continue taking her medication after release, B.K. indicated she would, if ordered to do so by the court. B.K. also indicated

that she would be willing to work with doctors after her discharge. B.K. acknowledged that, in that last six months, she had refused beneficial medication a few times, but that she behaved well while disobeying that order. No testimony was provided about how recently B.K. refused medication. Furthermore, B.K. explained that she believed it was important to take her medication consistently.

Finally, while Dr. Thomas opined that without medication, B.K. "would deteriorate in her functioning," Dr. Thomas did not elaborate on what "deteriorate in her functioning" means, and the court cannot speculate how this deterioration would manifest without more detailed testimony. This testimony is insufficient to evidence a high probability that, without medical treatment, there is a high likelihood that B.K. would suffer serious physical harm within the near future.

Since Dr. Thomas indicated that B.K. was resourceful enough to meet her basic needs in the community and provided minimal recent and tangible evidence that there was a high probability that B.K would stop taking her medication or how B.K. would deteriorate, there is insufficient evidence to support the trial court's conclusion that B.K. continued to be gravely disabled under RCW 71.05.020(22)(a).

D.

B.K. also contends that the State failed to prove that she continued to be gravely disabled under RCW 71.05.020(22)(b).

Under the second alternative, the petitioner must prove that the individual manifests severe deterioration in routine functioning and is therefore unable to make a rational decision with respect to his or her need for treatment. LaBelle, 107 Wn.2d at

208. Evidence of severe deterioration in routine functioning "must include recent proof of significant loss of cognitive or volitional control." Id. at 208.

> In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be showing to be essential to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.
>
> Furthermore, the mere fact that an individual is mentally ill does not also mean that the person so affected is incapable of making a rational choice with respect to his or her need for treatment. Implicit in the definition of gravel disability under [RCW 71.05.020(22)(b)] is a requirement that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment. This requirement is necessary to ensure that a causal nexus exists between proof of "severe deterioration in routine functioning" and proof that the person so affected "is not receiving such care as is essential for his or her health or safety."

LaBelle, 107 Wn.2d at 208 (emphasis added).

There is limited evidence in the record about B.K.'s recent loss of cognitive or volitional control due to her mental disorder. Dr. Thomas testified that B.K. has accused staff and others of assaulting her, has indicated that she has been telepathically assaulted on numerous occasions, and has mood changes which can include anger, but Dr. Thomas's testimony does not indicate whether these were recent or historical occurrences as required by RCW 71.05.020(22)(b). Additionally, Dr. Thomas opined that B.K. was escorted to seclusion because of out of control behavior, but there was no testimony indicating whether these seclusions were recent. To the contrary, Dr. Thomas testified that sometimes B.K. has very good judgment and that during her time in the hospital "her judgment has improved over time," she is "more invested in

-10-

treatment," and participates better. This testimony does not support a finding that B.K. was experiencing recent loss of cognitive or volitional control indicating a severe deterioration in her routine functioning.

A primary concern shared by Dr. Thomas and the court was that B.K. was unwilling to work toward a discharge plan. Dr. Thomas indicated that B.K. was "also struggling . . . working with the treatment team and developing a discharge plan which I think would be in her best interest to do. And some of her out of control behavior has been problematic for her as far as using good judgment." This, however, does not explain how B.K. manifests severe deterioration making her unable to make rational decisions with respect to her need for treatment. "It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interest." LaBelle, 107 Wn.2d at 208. Dr. Thomas did not explain why the care that B.K. was receiving was essential to her health and safety or the harmful consequences that would follow if B.K. did not receive treatment. The court should not need to speculate about these harmful consequences; those findings should be clearly explained by a doctor's testimony at the hearing. Dr. Thomas only opined that, without medication, B.K.'s condition would likely deteriorate and "maybe end up back in the hospital."

We conclude that there is insufficient evidence in the record demonstrating recent proof of significant loss of cognitive or volitional control to support the trial court's finding of grave disability.

No. 80104-0-I/12

Reversed.

_Mann, ACJ_

WE CONCUR:

_Andrus, J._    _Appelwick, CJ_