# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of: | No.  53060-1-II |
| T.D.B., | |
| Appellant. | UNPUBLISHED OPINION |

SUTTON, A.C.J. — TDB appeals from a trial court order extending his civil commitment to Western State Hospital (WSH) for an additional 180-days.[1]  He argues that the trial court's conclusion that he was gravely disabled was not supported because the trial court failed to enter express findings of fact as to (1) whether there was *recent* proof of his significant loss of cognitive or volitional control, (2) whether TDB was unable to make rational decisions with respect to his need for treatment, or (3) whether he would stop taking his medication if he was released.  TDB also argues that the trial court's gravely disabled conclusion was not supported by clear, cogent, and convincing evidence (1) of a recent "'significant loss of cognitive or volitional control'" or (2) that TDB would not receive essential care if released.  Br. of Appellant at 12 (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 208, 728 P.3d 138 (1986)).

TDB fails to present any authority or reasoned argument supporting his assertion that the trial court's conclusions of law are not adequately supported because the trial court failed to enter

___

[1] Although the 180-day confinement has expired, this appeal is not moot because the commitment has potential continuing consequences.  *In re Det. of M.K.*, 168 Wn. App. 621, 625, 279 P.3d 897 (2012).

additional findings of fact. Accordingly, we decline to address that argument. Because the trial court's findings support the conclusion of law that TDB is gravely disabled, we affirm.

## FACTS

### I. MARCH 2018 COMMITMENT, FORCED MEDICATION

In March 2018, TDB was found incompetent to stand trial on two counts of third degree assault of a healthcare provider, and the criminal charges were dismissed. The trial court subsequently issued an order committing TDB to WSH for up to 180 days. In June, the State successfully petitioned the trial court for an order allowing involuntary treatment with antipsychotic medication.

### II. AUGUST 2018 PETITION

In August, the State petitioned to extend TDB's commitment by 180 days. The State alleged that TDB (1) was still gravely disabled, and (2) had been detained following his attempt to inflict harm upon another person and "as a result of a mental disorder developmental disability presents a likelihood of serious harm." Clerk's Papers (CP) at 50. The State further alleged that TDB was "not ready for a less restrictive placement [(LRP)] and require[d] continued treatment at [WSH]." CP at 51 (emphasis omitted).

### III. JANUARY 18, 2019 HEARING

The August 2018 petition was not heard until January 18, 2019.[2] When the hearing started, the State advised the trial court that it was now relying exclusively on the allegation that TDB was gravely disabled and that TDB was ready for an LRP "[i]f an appropriate . . . [s]tructured placement

---

[2] Between August 2018 and the hearing date, the trial court granted numerous continuances.

was available." Report of Proceedings (RP) at 5. TDB's psychologist Dr. Larry Arnholt and TDB testified.

A. DR. ARNHOLT'S TESTIMONY

Dr. Arnholt testified that TDB "suffers schizoaffective disorder, bipolar," and that this was TDB's fifth hospitalization at WSH. RP at 8. Dr. Arnholt noted that TDB had "an unstable mood;" was "[c]onfused as mood;" and, despite improving since the petition was filed in August, he "continue[d] to be confused and impulsive." RP at 8-9.

Dr. Arnholt further testified that TDB "has some difficulty maintaining independent hygiene" but that this issue had "improved" and he was better able "to conduct his own activities of daily living" than he was when the petition was filed several months earlier. RP at 10, 13. Dr. Arnholt stated, however, that despite this improvement, there were still "some concerns" about TDB's hygiene and he still required "the occasional prompt." RP at 10, 13.

Dr. Arnholt then testified that TDB's "insight into his mental illness" was "very limited." RP at 11. Although TDB was currently taking his medication and cooperating with treatment "with encouragement," he was "suspicious regarding his medications" and still "den[ied] any need for medication." RP at 11, 16. Dr. Arnholt stated that it had been recommended that TDB receive injections if he was released into the community in order to stay in compliance with his medication, but "that's been a point of contention." RP at 12.

As to TDB's "judgment over the course of his treatment . . . at [WSH]," Dr. Arnholt testified:

> Well, it has improved. It was quite impaired when he initially came into the
> hospital. He remains confused. It's difficult for him to understand abstract
> information. His -- my history has [an IQ of] about 72. He's just slightly above

the cutoff range and he seems to deny if he'll do something then deny responsibility for having done it. But, recently, again, he has been more cooperative with treatment that I think the main concern was a great deal of impulsivity. He had a great deal of confusion and difficulty understanding what was going on around him.

RP at 11-12.

Dr. Arnholt further testified that TDB's criminal history included "criminal trespass and malicious mischief in 2/20/17," first degree theft in 1995, fourth degree assault, and third degree assault of a healthcare worker. RP at 12. Dr. Arnholt stated that he had considered TDB's criminal history, "history of contacts with law enforcement[,] and his history of civil commitments" when he determined that TDB was gravely disabled. RP at 12. Dr. Arnholt opined that TDB's history demonstrated that when he was not stable on his medication "he has difficulty maintaining acceptable behavior in the community." RP at 12.

Dr. Arnholt also testified that TDB's judgment, mood, and volitional control had improved somewhat and were currently stable. TDB's privilege level was now a level 4, the highest level of privilege. To be level 4, TDB had to be "on the active discharge list," which meant that he had attained his clinical baseline and had received the "maximum benefit from the hospitalization." RP at 16-17. But Dr. Arnholt explained that because "[t]he actual level of stability and independence varies from patient to patient," a patient could reach their baseline and "still suffer[] from significant symptoms of a mental illness." RP at 19-20.

Dr. Arnholt commented that when they discussed TDB's need for continued care, TDB would initially appear to understand, but he would then "get other ideas in his mind." RP at 18. Although TDB had indicated he would "continue to take medication," TDB was "not always consistent in what he says, what he intends to do or will do." RP at 18.

4

As to TDB's memory, Dr. Arnholt testified that it was difficult to assess because TDB would remember some things but also deny having any memory of other things. But TDB was "able to make his wants and needs known." RP at 19.

Dr. Arnholt stated, "If TDB was discharged without the proper structure and without the medication, I believe he would likely decompensate[3] further and likely would come to the attention of the authorities, either be rehospitalized or detained by law enforcement." RP at 13. Dr. Arnholt also expressed concern about TDB's "ability to keep himself healthy and safe if he was discharged without appropriate supports today," stating:

> I think he would likely be confused and stop the medication if they weren't provided if it weren't provided for him and recommended that he take it and I think that would result in further confusion and problems similar to those that resulted in the current hospitalization.

RP at 13.

Despite recognizing TDB's recent improvements, Dr. Arnholt still believed that TDB was "gravely disabled as a result of his mental illness." CP at 14. But Dr. Arnholt testified that placement in a less restrictive alternative where "they could monitor his medication," was now in TDB's best interest if such a placement could be found. RP at 14.

Dr. Arnholt commented that TDB had recently visited an adult family home and was accepted by the facility, but TDB "doesn't want to go." RP at 10. Dr. Arnholt stated that if the trial court agreed that a less restrictive placement was appropriate, TDB's treatment team would investigate potential options and would have to notify the prosecutor in advance of the placement.

---

[3] "Decompensation" is "the progressive deterioration of routine functioning supported by evidence of repeated or escalating loss of cognitive or volitional control of actions." *LaBelle*, 107 Wn.2d at 206.

But Dr. Arnholt cautioned that if TDB did not want to go to a placement, it "would be futile to send him." RP at 15.

B. TDB'S TESTIMONY

TDB testified that he did not want to remain at WSH and that if he were to leave, he would have to find a place to live. He stated that before he was committed, he had been living in his family's home, but he had not been in contact with his brothers about finding a place to live.

TDB further testified that prior to this commitment, he had been a dishwasher at a restaurant and he believed he could do this again if he were released. TDB did not think that he would have problems taking care of himself if he were released.

When his counsel asked whether he thought he was "confused," TDB responded, "I was never confused in the first place." RP at 24. TDB testified that he did not know and had never been told what medication he was on and admitted that he "was kinda scared about taking meds." RP at 24. He denied feeling any benefit from his medications and commented that they just made him swell up and break out in rashes. But TDB said that he would continue taking them if the doctors told him to.

C. ORAL RULING

After hearing the testimony and argument, the trial court gave the following oral ruling:

[TDB], it sounds like you've made some good improvements since August when the petition was filed. You're now on Level 4 grounds privileges and that you're doing a much better job with all aspects.

I do find that the State now has proven by clear, cogent, and convincing evidence that you are gravely disabled as a result of a mental health disorder. You've made such good progress, however, that less restrictive alternatives to detention are in your best interest. So I will order that they will continue treatment at Western State until that good structured, less restrictive alternative setting is found

6

in the community and I hope you take advantage of working with your treatment team to come up with that good placement.

RP at 29-30.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial court subsequently issued written findings of fact and conclusions of law that incorporated its oral ruling. In its written findings, the trial court found that TDB "as a result of a mental disorder [(1)] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions [and (2)] is not receiving such care as is essential for health and safety." CP at 61.

In addition to making these findings, the trial court included a section entitled "Facts in Support," which contained a description of the testimony set out above, without any credibility determinations:

**Facts in Support:**

The Court was advised of [TDB's] prior hospitalizations and detentions as follows: Per Testimony of Petitioner and Declaration in Support of Petition.

[TDB's] current mental status examination reveals:

**Dr. Arnholt testified**. [TDB] has been on the current ward since February 2018. He has unstable mood, he is quite confused. He is not a danger to others. He is confused and impulsive. He has a history of urinating in his room and saving his urine in a cup.

His hygiene has improved recently since the time the petition was filed in August 2018. He has been accepted at a [LRP] which he says he does not want to go to.

This is his 5th hospitalization at WSH.

Further, based on the petition and testimony of Petitioner, the Respondent:

[TDB] has limited insight into his mental health disorder. He does not like taking his medication. He attends therapy as recommended. It is difficult for him to

understand information. His IQ is 72. He does something and denies responsibility for doing it.

He has a history of criminal trespass and malicious mischief and assault 3 on a health care worker. Without the proper structure and medication, he would likely decompensate and have contact with law enforcement. An Adult Family Home is recommended by the treatment team and the community. The prosecutor needs to be notified based on his criminal history.

His [activities of daily living] are better than before. He has not done a formal evaluation since the petition was filed but see the respondent with the treatment team [sic].

He is suspicious with his medication. He is a level 4 with grounds privileges. This also means he is on the active discharge list. He has not had instances of assaultive behavior during this reporting period.

He indicates he will take medication in the community. He is fully oriented. He is able to make his wants and needs known.

**[TDB] testified.** If he was not at WSH he would need to find a place to stay. He has not been talking to his brothers about where to stay. He was living in his family's house before he came to WSH.

He has Level 4 grounds privilege since late November or December. He has 2 jobs, he is a gardener and picks up the trash. He used to wash dishes at a restaurant. He would not have a problem taking care of himself. He would take his medication of course.

He was never confused in the first place. If he could see [sic] he would stop taking his medication. He does not know the names of his medications. He kinda of swells up from his medication and gets hives and rashes.

He has to pay his bills. He has to go to work. They would be better at telling about how the preplacement visit went then he did.

CP at 61-62. The trial court's conclusion of law stated that TDB, "as a result of a mental disorder,"

was or "continue[d] to be gravely disabled." CP at 62.

The trial court ordered 180 days of further treatment and found that an LRP was in TDB's best interest. TDB appeals.

ANALYSIS

TDB argues that the trial court failed to make various findings of fact necessary to prove that he was gravely disabled. He also argues that the trial court's conclusion that he was gravely disabled was not supported by clear, cogent, and convincing evidence (1) of a recent "'significant loss of cognitive or volitional control'" or (2) that he would not receive essential care if released. Br. of Appellant at 12 (quoting *LaBelle*, 107 Wn.2d at 208). We disagree.

## I. LEGAL PRINCIPLES

The State's burden of proof in a 180-day involuntary commitment proceeding is by clear, cogent, and convincing evidence. *LaBelle*, 107 Wn.2d at 209. Thus, the ultimate fact in issue must be shown by highly probable evidence. *LaBelle*, 107 Wn.2d at 209.

Our review is "limited to determining whether substantial evidence [in light of the highly probable evidence test] supports the [trial court's] findings, and if so, whether the findings in turn support the trial court's conclusions of law and judgment." *LaBelle*, 107 Wn.2d at 209. Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294, 303 (2015).

An individual may be involuntarily committed for mental health treatment if he or she is gravely disabled as a result of a mental health disorder. *LaBelle*, 107 Wn.2d at 201-02;[4] RCW

---

[4] In *LaBelle*, our Supreme Court addressed former RCW 71.05.020(1) (1979), which the Legislature has since recodified at RCW 71.05.020(21) without any substantive changes relevant to this appeal. 107 Wn.2d at 202.

71.05.290(3).   Here, the trial court concluded that TDB was gravely disabled under RCW 71.05.020(21)(b).[5]   To establish that an individual is "gravely disabled" as a result of a mental health disorder under subsection (b), the State must prove that the individual "[(1)] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and [(2)] is not receiving such care as is essential for his or her health or safety."   RCW 71.05.020(21)(b).

## II.  ADDITIONAL FINDINGS

The trial court found that TDB manifested a severe deterioration in routine functioning.[6] To prove that an individual "'manifests severe [mental] deterioration in routine functioning,'" there must be "*recent* proof of significant loss of cognitive or volitional control."   *LaBelle*, 107 Wn.2d at 208 (emphasis added) (alteration in original) (quoting RCW 71.05.020(21)(b)).   TDB contends that the trial court's conclusion that he was gravely disabled is unsupported because the trial court did not make an express "finding" that there was *recent* proof of his significant loss of cognitive or volitional control.   Br. of Appellant at 14.   Also citing *LaBelle*, TDB further contends that the trial court's conclusion that he was gravely disabled is unsupported because the trial court did not make express "finding[s]" that he was unable to make rational decisions with respect for

---

[5] The legislature amended RCW 71.05.020 several times in 2019 and 2020.  Laws of 2019, ch. 446 § 2; Laws of 2019, ch. 444 § 16; Laws of 2019, ch. 325 § 3001; Laws of 2020, ch. 5 §1; Laws of 2020, ch. 80 § 51; Laws of 2020, ch. 256 § 301; Laws of 2020, ch. 302 §§ 3, 4.  These amendments renumbered the relevant subsection but did not make any substantive changes.  Accordingly, we cite to the current version of the statute.

[6] TDB does not challenge the trial court's characterization of whether TDB manifested a severe deterioration in routine functioning as a finding of fact.

his need for treatment or that he would stop taking his medication if he was released. Br. of Appellant at 15-16.

"Implicit in the definition of gravely disabled . . . is a requirement that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *LaBelle*, 107 Wn.2d at 208 (emphasis omitted). Here, as discussed above, the trial court made that finding. And although *LaBelle* establishes that recent proof of a significant loss of control and an inability to make rational decisions with respect to his need for treatment or ability to maintain his medication are factors related to whether TDB was gravely disabled, *LaBelle* did not require a trial court to make express findings of these factors. And TDB does not cite any authority requiring the trial court to make additional express findings, nor does he present any reasoned argument regarding whether such express additional findings were required. Accordingly, we decline to address these arguments. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

### III. SUFFICIENCY ARGUMENTS

#### A. SEVERE DETERIORATION IN ROUTINE FUNCTIONING

To prove that an individual "manifests severe [mental] deterioration in routine functioning," the State must present "recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208 (alternation in original). TDB argues that the evidence was insufficient to support the trial court's finding that he manifested a severe deterioration in routine functioning because the State failed to present *recent* proof of significant loss of cognitive or volitional control in light of the evidence that his condition had recently improved. We disagree.

11

TDB's focus on his condition at the time of the hearing is too narrow. The State may still establish recent proof of significant loss of cognitive or volitional control even though the individual has stabilized or improved while in the hospital. *LaBelle*, 107 Wn.2d at 207.

TDB does not argue that the evidence was insufficient to establish that he had suffered a significant loss of cognitive or volitional control immediately prior to his improvement while at WSH. But even if he were to make this argument, it would fail because the record provides ample evidence of severe loss of cognitive or volitional control immediately prior to and during TDB's stay at WSH.

TDB was committed less than a year before the January hearing, at which point he had decompensated to the point he had assaulted a healthcare worker. And Dr. Arnholt testified that TDB was "quite impaired when he initially came into the hospital" and that he suffered "a great deal of confusion" and found it "difficult" to "understand[] what was going on around him" until just prior to the January hearing. RP at 11-12. Dr. Arnholt also testified that although TDB had improved with treatment, he still had "an unstable mood;" was "[c]onfused as mood;" and "continue[d] to be confused and impulsive." RP at 8-9.

This evidence demonstrates a significant loss of cognitive or volitional control prior to TDB's admission and during his most recent commitment. It also establishes that this loss of cognitive control, although improved, still existed to some degree at the time of the January hearing. This evidence comprises recent proof of loss of cognitive or volitional control and is sufficient to establish a significant loss of cognitive or volitional control by clear, cogent, and convincing evidence. Accordingly, this sufficiency argument fails.

B.  ABILITY TO MAKE RATIONAL DECISIONS REGARDING TREATMENT

TDB further argues that the evidence was insufficient to support the trial court's finding that he was not receiving or would not receive such care as is essential for his health and safety. We disagree.

When the State proceeds under RCW 71.05.020(21)(b), it must present "evidence" of "a factual basis" sufficient to establish that "the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety."  *LaBelle*, 107 Wn.2d at 208. "Implicit in the definition of gravely disabled . . . is a requirement that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment."  *LaBelle*, 107 Wn.2d at 208 (emphasis omitted).

Our Supreme Court has explained that one purpose of the gravely disabled alternative for civil commitment is to combat "the 'revolving door' syndrome" wherein individuals are released from the hospital into the community without support and soon decompensate and require further hospitalization.  *LaBelle*, 107 Wn.2d at 206.  The goal is to "permit[ ] intervention before a mentally ill person's condition reaches crisis proportions."  *LaBelle*, 107 Wn.2d at 206.  The gravely disabled alternative enables the State to provide the "kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning."  *LaBelle*, 107 Wn.2d at 206.

To further facilitate this goal, RCW 71.05.285 allows the trial court to place great weight on evidence of an individual's prior history of decompensation and discontinuation of treatment that results in repeated hospitalizations. Such evidence may be used as a "factual basis" for determining "that the individual would not receive, if released, such care as is essential for his or her health or safety." RCW 71.05.285.

TDB contends that the evidence was insufficient to support the trial court's finding that he was not receiving such care as is essential for his health and safety because the evidence established that he was able to make rational decisions regarding his need for treatment and that he would continue treatment. He asserts that the evidence shows that "he was cooperative with treatment and intended to continue medication once released." Br. of Appellant at 16.

The testimony established that TDB was cooperative with treatment at the time of the January hearing, and TDB testified that he would comply with his medication requirements if released. But the testimony also established that TDB was compliant with his treatment requirements only when "encouraged" and that he had a history of decompensation. RP 16. And Dr. Arnholt testified that TDB's behavior was not always consistent with what he said, that it was vital TDB remain in an environment that would ensure he took his medication, and that there was a significant risk TDB would decompensate if released without structured support.

Dr. Arnholt's and TDB's testimonies also demonstrated that TDB had limited insight into his mental health issues or his need for medication, which increased the likelihood that he was unable to make rational decisions with respect to his need for treatment and likely to discontinue his medications unless he was in a controlled environment. TDB testified that he had not been "confused" at the time of his latest commitment, that he was not deriving any benefit from his

medication, and that he was "scared" of taking medication. RP at 24. TDB also focused on the side effects of the medication rather than its benefits. Additionally, Dr. Arnholt testified that TDB's "insight into his mental illness" was "very limited." RP at 11. Dr. Arnholt also testified that TDB cooperated with his treatment and mediation only "with encouragement;" that he was "suspicious" of his medication; and that although injections were recommended if TDB were to be released in the community to ensure his compliance, this was a "point of contention" with TDB. RP at 11, 16.

TDB's significant history of mental health commitments, numerous decompensations, and the need for the trial court to issue an order allowing for involuntary medication also show that TDB lacked insight into his need for treatment and an inability to maintain his medication. RCW 71.05.285 (individual's prior history of decompensation resulting in repeated hospitalizations can supply a factual basis for concluding an individual will not receive such care as is essential for his or her health or safety if released).

This evidence demonstrates that TDB was unable to make rational decisions with respect to his need for treatment and was unlikely to continue his medication if released. There is clear, cogent, and convincing evidence supporting the trial court's finding that TDB would not receive "such care as is essential for health and safety" if released. CP at 61. Accordingly, his sufficiency argument fails.

No. 53060-1-II

CONCLUSION

Because TDB failed to adequately support his arguments that the trial court should have made additional findings, we decline to address those arguments. Because the trial court's findings support the conclusion of law that TDB is gravely disabled, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

LEE, C.J.

WORSWICK, J.