IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of: | No. 79727-1-I |
| M.L., | DIVISION ONE |
| Appellant. | UNPUBLISHED OPINION |

LEACH, J. — M.L. appeals the trial court's order for an involuntary 14 day commitment. He contends the State failed to prove by a preponderance of the evidence that he is in danger of serious physical harm and that he is gravely disabled as the result of his mental impairment. He also challenges the sufficiency of the evidence to support an unnumbered Finding of Fact, and Findings of Fact 2, 3, and 4. Because substantial evidence supports all the trial court's findings, we affirm.

BACKGROUND

On March 1, 2019, M.L. went to the Renton Airport in search of an airplane to take him to Area 51 so that he could board a "UFO". Renton Police Officers responded to the airport and found M.L. with a mango and bananas while wearing welding gloves and protective glasses. Officers observed M.L. seemed confused. M.L. agreed to go to Valley Medical Center.

At Valley Medical Center, emergency room crisis counselor Mark Thomasseau met with M.L. Thomasseau asked M.L. if he knew why he was

Citations and pincites are based on the Westlaw online version of the cited material.

there. M.L. responded he was receiving skin and eye treatment. Thomasseau found M.L. hard to understand because he mumbled. When Thomasseau left M.L.'s room, he observed M.L. take off his hospital gown, stand, and stare at a wall. Hospital staff helped M.L. put the gown back on, but M.L. would repeatedly take it off and stare at the wall. Thomasseau observed that M.L. "could not clearly state what he would do, where he would go, [and] how he would take care of himself," if he was discharged. He believed M.L. was "too disorganized to be discharged." A King County Designated Crisis Responder completed a petition for M.L.'s initial commitment.

On March 5, 2019, M.L. was transferred to Navos Behavioral Hospital for inpatient services. There, Dr. Julia Singer, a licensed clinical psychologist, met with M.L. and diagnosed him with schizophrenia. Dr. Singer found it difficult to understand M.L. because he mumbled, spoke rapidly, and talked about UFOs.

Dr. Singer determined that if M.L. was discharged due to schizophrenia, he would be unable to care for his health and safety. Dr. Singer partially based the determination on M.L.'s social services assessment packet that stated he suffered from malnutrition, "significant weight loss," and "muscle wasting" related to his restrictive fruitarian diet. Dr. Singer was concerned that M.L. would suffer further health problems from malnutrition if he were discharged from the hospital. M.L. told Dr. Singer that he would not take his medication when discharged. Navos filed a petition for 14 days of involuntary treatment under RCW 71.05.

On March 6, 2019, the court held a probable cause hearing. The court found that M.L. was "gravely disabled" as a result of "mental disorder" and was in

2

"danger of serious physical harm due to failure to provide for his essential needs of health and safety." In making this determination, the trial court relied on the fact that M.L. was "underweight, malnourished…on a very restricted diet by choice, and has muscle-wasting." The trial court stated it was concerned that "there was not the testimony of a medical doctor to provide the court with information on…the risk [M.L.'s diet] causes to his health ultimately if he is released into the community." But, it found the State met its burden of showing M.L. is gravely disabled even without the evidence of malnutrition and muscle wasting. The trial court found the State met its burden by showing M.L.'s "communication difficulties, his delusions regarding going to Area 51 and seeking a UFO, and his taking off his…gown." The court determined less restrictive alternative means were not in M.L.'s best interest, and ordered 14 days of involuntary commitment at Navos.

M.L. appeals.

ANALYSIS

M.L. asserts the trial court should not have entered the commitment order because the State failed to prove by a preponderance of evidence that he was in danger of serious physical harm resulting from a failure to provide for his essential needs and that he was gravely disabled.

To commit a person for 14 days of involuntary treatment, the State must show by the "preponderance of the evidence that such person, as the result of a mental disorder…presents a likelihood of serious harm, or is gravely disabled..."[1]

---

[1] RCW 71.05.240(3).

A person who "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety" as a result of a mental disorder is gravely disabled.[2] To show the person is in danger, "the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded."[3]

When the trial court has weighed the evidence, we generally limit our review to determining whether substantial evidence supports its findings, and if so, whether the findings in turn support the trial court's conclusions of law and judgment.[4] We "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence."[5] "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise."[6] "The substantial evidence standard is deferential and requires the appellate court to view all evidence and inferences in the light most favorable to the prevailing party."[7]

Sufficient evidence supports the trial court's finding that M.L. was in danger of "serious physical harm resulting from failure to provide for his essential needs of health and safety." M.L. could not explain to Thomasseau or Dr. Singer

---

[2] RCW 71.05.020(22).

[3] In re LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986).

[4] In re Det. of W.C.C., 193 Wn. App. 783, 793, 372 P.3d 179 (2016) (citing LaBelle, 107 Wn.2d at 209).

[5] LaBelle, 107 Wn.2d at 209.

[6] Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978).

[7] Lewis v. Dep't of Licensing, 157 Wn.2d 446, 468, 139 P.3d 1078 (2006).

where he would live and how he would take care of himself if he were discharged from the hospital. M.L. said that he would not take his medication if he were discharged. Because M.L. could not explain how he would take care of his essential needs, and because he said he would not take medicine as prescribed, he was in danger of serious physical harm.

M.L. asserts the State presented insufficient evidence of a nexus between M.L.'s danger of serious physical harm and his grave disability. We disagree. Because sufficient evidence supports the finding that M.L. was in danger of serious physical harm if discharged, sufficient evidence supports the trial court's findings that M.L. was gravely disabled. The finding that M.L. was gravely disabled is also supported by testimony about his "communication difficulties, his delusions regarding going to Area 51 and seeking a UFO, and his taking off his…gown."

Next, M.L. challenges the sufficiency of the evidence supporting multiple findings of fact. Our review of the record discloses substantial evidence to support each finding.

M.L. challenges Finding of Fact 2, which states, "The Respondent's mental impairment has had a substantial adverse effect on his cognitive function and volitional control." Dr. Singer testified she believed M.L.'s schizophrenia was having an adverse effect on both his cognitive abilities and his volitional function. She found that "his thinking appeared to be quite disorganized." M.L. could not explain to Thomasseau or Dr. Singer why he was hospitalized. Because sufficient evidence supports this finding, M.L.'s challenge fails.

5

M.L. challenges the unnumbered Finding of Fact finding M.L. gravely disabled, and Finding of Fact 3 finding:

> As a result of his Schizophrenia, the Respondent is Gravely Disabled (Prong A) and is in danger of serious physical harm due to a failure to provide for his essential needs of health and safety as evidenced, inter alia, by the testimony of Dr. Julia Singer and the Navos medical record indicating that the Respondent is underweight, malnourished, and is experiencing muscle wasting.

These challenges fail for the same reason the challenge to the finding that he was gravely disabled fails. Evidence of M.L.'s communication difficulties, delusions, and refusal to take medicine if discharged supports the finding that M.L. was in danger of serious physical harm and that he was gravely disabled.

M.L. also challenges Finding of Fact 4 which states, "The court finds the testimony of court evaluator Dr. Julia Singer to be credible and Respondent was in danger of serious physical harm as a result of poor food intake. The court additionally finds that the Respondent's Schizophrenia is causing his food limitations based on Dr. Singer's testimony." The trial court was concerned about the health consequences of M.L.'s fruitarian diet and whether the State proved M.L. was in danger of physical harm from being underweight and malnourished. But, in the end, the trial court's determination that M.L. was in "danger of serious physical harm due to a failure to provide for his essential needs of health and safety" was not solely based on his diet. The trial court found that M.L. was having difficulty communicating and suffered from delusions. M.L.'s difficulties communicating and delusions, combined with his inability to articulate a plan for meeting his essential needs, provide substantial evidence to support the

6

commitment order. Because the findings of fact are supported by substantial evidence, involuntary treatment was warranted.

## CONCLUSION

Substantial evidence supports the court's findings that M.L. was gravely disabled and in danger of serious physical harm. And, these findings support the commitment order. So, we affirm.

_Leach, J._

WE CONCUR:

_Dwyer, J._    _Appelwick, J._