IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Detention of | No. 82065-6-I |
| M.M. | DIVISION ONE |
| | UNPUBLISHED OPINION |

CHUN, J. — A Pierce County Superior Court commissioner entered an order involuntarily committing M.M. for up to 180 days of mental health treatment on grounds of her grave disability. M.M. moved to revise the order, which motion the trial court denied. M.M. appeals. We affirm.

## I. BACKGROUND

M.M. is 72 years old and suffers from an unspecified delusional disorder. She first began to exhibit related mental health symptoms at the age of 41. In May 2019, M.M. was evicted from her apartment. She returned to the apartment multiple times after the eviction, claiming she had not been evicted. On one such instance, law enforcement brought her to Recovery Resource Center,[1] where a designated crisis responder evaluated her for detention.

Following petitions by care providers, a Pierce County Superior Court commissioner involuntarily committed M.M. for a 14-day stay, and then a 90-day stay, at Telecare, an evaluation and treatment center.

---

[1] Recovery Resource Center is apparently a mental health treatment center.

Citations and pin cites are based on the Westlaw online version of the cited material.

Care providers then petitioned for 180 days of involuntary treatment. A Pierce County Superior Court commissioner held a hearing on the 180-day petition at which a Telecare mental health clinician and M.M.'s daughter testified.

The clinician testified that she examined M.M. five days before the hearing, and that during the examination, M.M. was appropriately dressed and groomed, her memory was intact, and she denied hallucinations and suicidal and homicidal ideation. But the clinician also stated that M.M. was delusional. The clinician testified that M.M. stated it was illegal to evict her from her apartment since she had paid an electricity bill there, and that lead in the water at the apartment building was poisoning the residents. The clinician also stated that M.M. had delusions about someone impersonating her daughter. The clinician testified that M.M.'s judgment and insight were impaired, since they had presented her with 40 to 50 housing options, but M.M. had rejected all of them because she was afraid a roommate would get her in trouble with law enforcement. The clinician testified that M.M. preferred to live in her car, which she had done before in her daughter's backyard. But the clinician learned from the daughter that M.M. had done so in temperatures exceeding 80 degrees Fahrenheit, and could not tell that it was too hot for her to sleep in the car. The clinician also stated that M.M.'s plans to live in her car were not safe because of her age. The clinician testified that M.M. stated she would refuse medication once discharged and had no plans to participate in outpatient therapy, and that M.M. had not responded to medication given to her while detained. She testified that a less restrictive alternative than a 180-day commitment would not serve

M.M.'s best interest, since M.M. would not be able to care for herself and planned to refuse medication.

The daughter testified that M.M. had slept in her car in the daughter's backyard for a period during summer of 2017 and described M.M. as "frail." She also testified that M.M. believed she could still live in her apartment since she had paid an electricity bill, and that M.M. "has got split realities."

Following the hearing, the commissioner entered findings of fact and conclusions of law, and an order involuntarily committing M.M. for a 180-day stay. The order found that M.M. is delusional, has impaired judgment and insight, lacks cognitive and volitional control, and that her discharge plan would not be safe. Based on the foregoing testimony, the commissioner found that because of a mental disorder, M.M. manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over her actions and is not receiving such care as is essential for her health or safety. It ultimately found by clear, cogent, and convincing evidence that M.M. is gravely disabled.

M.M. moved to revise the order, which motion the trial court denied after a hearing.

## II. ANALYSIS

M.M. says that insufficient evidence supports the trial court's finding that she is gravely disabled. We conclude the trial court's grave disability finding is supported by substantial evidence, which the trial court could have reasonably found to be clear, cogent, and convincing.

Under chapter 71.05 RCW, a court may involuntarily commit a person for the treatment of a mental disorder if, because of the disorder, they are gravely disabled. In re Det. of LaBelle, 107 Wn.2d 196, 201–02, 728 P.2d 138 (1986). "Gravely disabled" means:

> A condition in which a person, as a result of a behavioral health disorder: (a) is in danger of serious physical harm resulting from a failure to provide for [their] essential needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety.

RCW 71.05.020(23). The trial court found that M.M. is gravely disabled under subsection (b) of the definition. When determining whether a person is gravely disabled under this subsection, a court should consider "(1) whether the person is showing severe deterioration of routine functioning, evidenced by recent proof of loss of cognitive or volitional control, and (2) whether they would receive the care they need to maintain their health and safety if released." In re Det. of D.W., 6 Wn. App. 2d 751, 759, 431 P.3d 1035 (2018). The evidence supporting a grave disability finding "must show that the person is unable to make a rational choice about [their] need for treatment, creating a 'causal nexus' between the person's severe deterioration in routine functioning and evidence that [they] would not receive essential care if [they] were released." Id. (quoting LaBelle, 107 Wn.2d at 208). Subsection (b) enables the State to provide the kind of continuous care and treatment that can break "'revolving door' syndrome, in which patients often move from the hospital to dilapidated hotels or residences or even alleys, parks, vacant lots, and abandoned buildings, relapse, and are then

rehospitalized, only to begin the cycle over again." LaBelle, 107 Wn.2d at 206 (quoting Rhoden, The Limits of Liberty: Deinstitutionalization, Homelessness, and Libertarian Theory, 31 Emory L.J. 375, 391 (1982)).[2]

The State bears the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. In re Det. of R.H., 178 Wn. App. 941, 945–46, 316 P.3d 535 (2014); RCW 71.05.310. "[W]e will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent, and convincing." LaBelle, 107 Wn.2d at 209.

We conclude the State has borne its burden of proof. The clinician's evaluation of M.M. came just five days before the involuntary commitment hearing. Her testimony established that M.M. suffers from delusional thinking about her living situation and daughter, and that she planned to reject medication and more reliable housing in favor of living in her car. The daughter testified that M.M. "has got split realities." This constituted recent evidence of M.M.'s loss of cognitive and volitional control.

M.M. says that it is not the place of a court to "[impose] majoritarian values on a person's chosen lifestyle which, although not sufficiently harmful to justify commitment, may be perceived by most of society as eccentric, substandard, or otherwise offensive," so it was inappropriate to override her decision to live in her

---

[2] M.M. says that a pattern of repeated hospitalizations or law enforcement intervention is necessary to establish a nexus between a person's mental health deterioration and a court's determination that the person would not receive essential care if released, and that she has no such history. But Division Two of this court rejected this argument in D.W. 6 Wn. App. 2d at 759.

car. Id. at 204. But as noted by the revision court, a younger person may be able to endure more physical hardship than a frail person in their seventies. The hearing testimony also established that M.M. had previously lived in her car but had not been able to tell when it was too hot to be in the car. And M.M. stated she would decline medication once released and had no plans to participate in outpatient therapy. This constituted evidence that M.M. would not receive the care she needed to maintain her health and safety if released.

We conclude the trial court's grave disability finding is supported by substantial evidence, which the trial court could have reasonably found to be clear, cogent, and convincing.[3]

We affirm.

_Chun, J._

WE CONCUR:

_____          _____

---

[3] M.M. says the trial court's findings of fact are not sufficiently specific to permit review of its finding that she is gravely disabled. Such findings must indicate that the court considered the applicable criteria and the factual basis underlying the conclusion that the person is gravely disabled. LaBelle, 107 Wn.2d at 220. Since the findings support the conclusion that M.M. is showing severe deterioration of routine functioning, evidenced by recent proof of loss of cognitive or volitional control, and that she would not receive the care she needs to maintain her health and safety if released, they are adequate.